UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
ANGELA BARKHOUSE and TONI SHUKLA, as
liquidators of AFFINITY EQUITY
INTERNATIONAL PARTNERS LIMITED, ALSEN
CHANCE HOLDINGS LIMITED, AABAR
INVESTMENTS PJS LIMITED, and BLACKSTONE
ASIA REAL ESTATE PARTNERS LIMITED (IN
LIQUIDATION),

                         Plaintiffs,

      - against -

KASSEEM DEAN, MONZA STUDIOS, INC., and
SWIZZ BEATS PRODUCTIONS INC.,

                      Defendants.
---------------------------------------X

**MEMORANDUM AND ORDER**

24 Civ. 7491 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs Angela Barkhouse and Toni Shukla (together, the "Liquidators" or "plaintiffs"), as the joint liquidators of Affinity Equity International Partners Limited ("Affinity"), Alsen Chance Holdings Limited ("Alsen Chance"), Aabar Investments PJS Limited ("Aabar-BVI"), and Blackstone Asia Real Estate Partners Limited ("Blackstone" and, together with Affinity, Alsen Chance, and Aabar-BVI, the "Insolvent Entities"), filed this complaint on October 2, 2024, against defendants Kasseem Dean ("Dean"), Monza Studios, Inc. ("Monza Studios"), and Swizz Beatz Productions Inc. ("Swizz Beatz PI" and, together with Dean and Monza Studios, "defendants"). ECF No. 1. On December 30, 2024, plaintiffs filed an amended complaint, ECF No. 20 ("Amended Complaint" or "AC"),

alleging (1) actual fraudulent conveyance under New York State's former[1] Debtor and Creditor Law ("DCL") §§ 276 and 276-a, (2) constructive fraudulent conveyance under DCL §§ 273-75, and (3) unjust enrichment.

More specifically, plaintiffs seek to recover $7.3 million in funds transferred from Affinity and Alsen Chance (the "Debtors") to Kasseem Dean, a music producer, artist, and record executive, and several of his companies. AC ¶¶ 2, 28. Dean was a friend of Low Taek Jho ("Jho Low" or "Low"), a Malaysian businessman and fugitive who masterminded the now-infamous $7.65 billon fraud (the "1MDB Fraud" or "1MDB Scandal") against the 1 Malaysia Development Berhad sovereign wealth fund ("1MDB") and SRC International Sdn Bhd ("SRC International"). Id. ¶¶ 2-3. Low and his associates Hj Abdul Razak Najib ("Najib"), Eric Tan Kim Loong ("Tan"), Mohamed Ahmed Badawy Al-Husseiny ("Al-Husseiny"), and Khadem Abdulla Al Qubaisi ("Al Qubaisi") (collectively, "the Insiders"), caused Aabar-BVI and Blackstone (collectively, the "Creditors") and other

---

[1] "New York's Debtor and Creditor Law was amended effective April 4, 2020," and "[a]fter April 4, 2020, what were once [DCL] § 276 and § 273, capturing actual and constructive fraudulent conveyance, have now become § 273(a)(1) and § 273(a)(2), respectively." Espire Ads LLC v. TAPP Influencers Corp., 21 Civ. 10623 (JGK), 655 F. Supp. 3d 223, 268 (S.D.N.Y. 2023). However, the pre-amendment DCL "is operative here . . . because the new law does not apply to a transfer made or obligation incurred before the act's effective date, April 4, 2020[.]" Ray v. Ray, No. 20 Civ. 6720 (PAE), 2021 WL 1164655, at *4 (S.D.N.Y. Mar. 25, 2021), aff'd, 22 F.4th 69 (2d Cir. 2021) (internal quotations marks and citation omitted). The last transfer at issue occurred on September 4, 2014, AC ¶ 4, Table 1, and, consequently, the pre-amendment version of the DCL applies.

companies to transfer funds originating with 1MDB or SRC International to the Debtors. <u>Id.</u> ¶¶ 3-4, 62-112. Low and Tan then caused the Debtors to transfer a portion of those funds to Dean and his wholly-owned companies. <u>Id.</u> ¶¶ 113-23. Plaintiffs allege that both the Creditors and Debtors were shell companies with no revenue or operations, and that the Insiders used them as pass-through entities for personal transactions, including the cash transfers to Dean. <u>Id.</u> ¶¶ 2-3, 63-67. None of the transfers were made for any consideration and, as of the filing of the Amended Complaint, none of the funds have been returned. <u>Id.</u> ¶¶ 113-23, 134-41.

Now pending before the Court is defendants' motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF No. 25.

**BACKGROUND**[2]

In this section, we will set out the facts as alleged in the Amended Complaint, including (i) the background of the 1MDB Fraud, (ii) the transactions at issue, and (iii) the appointment of plaintiffs as liquidators.

---

[2]    The facts herein are drawn from plaintiffs' Amended Complaint. For the purposes of a motion to dismiss, the Court must "accept[] as true all factual allegations in the complaint and draw[] all reasonable inferences in [plaintiffs'] favor[.]" <u>Acticon AG v. China N.E. Petrol. Holdings Ltd.</u>, 692 F.3d 34, 37 (2d Cir. 2012).

I.    **The 1MDB Fraud and the Insiders**

As plaintiffs allege the challenged transfers were part of what became known as the 1MDB Fraud, we set out an overview of the 1MDB Fraud.   1MDB was founded by Najib, who served as Prime Minister of Malaysia from 2009 to 2018, Minister of Finance from 2008 to 2018, and Chairman of the 1MDB Board of Advisors from 2009 to 2016.  AC ¶¶ 48, 62.  1MDB was established as a sovereign wealth fund, with the purpose of financing development and other projects to benefit the Malaysian people.  Id. ¶¶ 2, 62.  SRC International was a sister company to 1MDB that was similarly victimized by Najib and the Insiders.  Id. ¶ 2.  Jho Low served as an advisor to a predecessor entity of 1MDB and assisted Najib in 1MDB's creation. Id. ¶¶ 36-37, 48.  Low operated as an "intermediary" for Najib, 1MDB, and various other Malaysian officials.  Id. ¶ 37.

On February 8, 2015, The New York Times published a story[3] detailing the relationship between Najib, Low, 1MDB, and SRC

---

[3]     Louise Story and Stephanie Saul, Jho Low, Well Connected in Malaysia, Has an Appetite for New York, N.Y. Times (February 8, 2015), https://www.nytimes.com/2015/02/09/nyregion/jho-low-young-malaysian-has-an-appetite-for-new-york.html ("Mr. Low's lavish spending has raised eyebrows and questions from Kuala Lumpur to New York, where he has made a boldface name for himself as a 'whale' at clubs like the Pink Elephant and 1Oak.  The New York Post once called him 'the mystery man of city club scene,' adding, 'Speculation is brewing over where Low is getting his money from.'  One answer resides at least indirectly in his relationship, going back to his school days in London, with the family of Malaysia's prime minister, Najib Razak.  Mr. Low has played an important role in bringing Middle Eastern money into numerous deals involving the Malaysian government, and he helped set up, and has continued to advise [1MDB], a Malaysian sovereign wealth fund that the prime minister oversees."). This article is referenced in the Amended Complaint, AC ¶ 136, but we only take notice of the article for the fact of its being published, and not for the truth of its contents.  See Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) ("We have previously held that it is proper to take judicial

International, and questioning the provenance of Najib and Low's real estate and other "lavish expenditures." Id. ¶ 136. Scrutiny on 1MDB escalated abroad and in the United States over the following months. In January 2015, 1MDB failed to make a $550 million loan payment. Id. ¶ 124. When Malaysia's government initiated an investigation into the fund in early 2015, Low and his associate, Eric Tan, fled Malaysia. Id. ¶¶ 125-26. In 2016, 1MDB missed another payment on a $1.75 billion bond, leading to cascading defaults on its other debts. Id. ¶ 128. Najib, still positioned as Prime Minister and Minister of Finance, blocked investigations into 1MDB for several years, including by sacking the Malaysian attorney general and removing critics from his cabinet. Id. ¶ 127.

After Najib's defeat in the 2018 Malaysian general elections, the new Malaysian government declared 1MDB and SRC International insolvent and created a "1MDB Asset Recovery Taskforce" to claw back the funds stolen by Najib, Low, and their accomplices. Id. ¶ 129. The Malaysian taskforce uncovered a sprawling conspiracy, in which hundreds of sham entities were used to facilitate thousands of fraudulent transactions. Id. ¶ 130.

The unfolding scandal also led to law enforcement action in the United States. In 2016, the Department of Justice initiated

---

notice of the fact that press coverage . . . contained certain information, without regard to the truth of [the] contents[.]").

asset forfeiture actions seeking over $1 billion in stolen funds. Id. ¶ 137. Then, in November 2018, the DOJ unsealed an indictment charging Low and others with a criminal conspiracy to launder billions in embezzled 1MDB assets through various U.S. entities. Id. ¶ 138.

One of the many civil forfeiture actions initiated by the DOJ in this period sought the surrender of the Andy Warhol portrait "Round Jackie," which Low had purchased and subsequently gifted to Dean in 2014. Id. ¶¶ 41, 138-39. Dean agreed to relinquish the portrait in a September 2020 consent judgment, in which he acknowledged the existence of "reasonable cause" for its forfeiture. Id. ¶ 41.

## II. The Transfers

The alleged fraudulent transfers in this case concern a small portion of the transactions comprising the larger 1MDB Fraud. Mr. Dean and his companies allegedly received $7.3 million of the $7.65 billion dollars siphoned from 1MDB and SRC International by Low, Najib, and their co-conspirators. AC ¶ 2. There is no allegation in the Amended Complaint that Dean was a participant in the 1MDB Fraud beyond his alleged receipt of fraudulently obtained funds. We will briefly recount the history of how funds originating with 1MDB and SRC International made their way to the Insolvent Entities, and subsequently to Dean.

**a. The Aabar-BVI Phase**

In 2012, 1MDB hired Goldman Sachs to market and underwrite two major bonds issuances, titled "Project Magnolia" and "Project Maximus." AC ¶ 71. In Project Magnolia, 1MDB and its subsidiary 1MDB Energy sought financing from investors to purchase a power production company. Id. ¶¶ 72-73. The offering circular released by 1MDB represented that the $1.75 billion it was seeking would "partially fund" the acquisition of the power company and that the rest would be allocated for 1MDB's "general corporate purposes." Id. ¶¶ 74-75. Similarly, in Project Maximus, 1MDB sought another $1.75 billion loan, ostensibly to acquire energy assets from a Malaysian company named Genting Berhad. Id. ¶¶ 77-78. Again, the offering circular represented that a portion would be allocated to the transaction, while another portion would be designated "for general corporate purposes." Id. ¶¶ 77-80.

Neither the Project Magnolia nor the Project Maximus funds made their way to their intended destinations. Within one day of receiving the Project Magnolia bond proceeds, approximately $577 million was diverted from 1MDB to Aabar-BVI, one of the Insolvent Entities. Id. ¶ 76. And within one day of receiving the Project Maximus funds, approximately $790 million was again diverted from 1MDB to 1MDB Energy Langat, one of 1MDB's wholly-owned subsidiaries, and then to Aabar-BVI. Id. ¶ 81. Aabar-BVI, one of the Insolvent Entities, was allegedly controlled by the Insiders

and used as a shell company to facilitate the 1MDB Fraud.[4]  Id. ¶¶ 53, 63-65.

After Aabar-BVI received the 1MDB funds from Project Magnolia and Project Maximus, the funds were channeled through a series of shell companies including Blackstone, another one of the Insolvent Entities controlled by Low and Tan.  Id. ¶¶ 64, 82-83.  Ultimately, a portion of the funds were deposited in bank accounts held by the Debtors, Alsen Chance and Affinity, who, at the behest of Low and/or Tan, transferred them to defendants Swizz Beats PI and Monza Studios, two of Dean's companies.  Id. ¶¶ 84-89.  These transactions are detailed in the charts below.

---

[4]     Al-Husseiny, one of the Insiders, was a close associate of Low's and the Chief Executive Officer of Aabar Investments PJS ("Aabar UAE"), a subsidiary of the International Petroleum Investment Company ("IPIC").  AC ¶ 56.  IPIC is an investment fund wholly owned by the Emirate of Abu Dhabi.  Id.  Al Qubaisi served as Managing Director of IPIC and was also an associate of Low's.  Id. ¶¶ 52-53.  Together, Al-Husseiny and Al Qubaisi were directors and beneficial owners of Aabar-BVI and another shell company, Aabar Seychelles.  Id. ¶ 53. IPIC has declared both companies were "outside [its] corporate structure."  Id. Both men were indicted by the UAE government in 2019 and are currently serving prison sentences for their role in the 1MDB Fraud.  Id. ¶ 54.

| Project Magnolia | | | |
|---|---|---|---|
| **Date** | **Sending Party** | **Receiving Party** | **Amount** |
| 05/22/2012 | 1MDB Energy | Aabar-BVI | $576,943,490 |
| 05/25/2012 | Aabar-BVI | Blackstone | $295,000,000 |
| 05/29/2012 – 08/01/2012 | Blackstone | Alsen Chance | $ 32,375,000 |
| 07/25/2012 | Aabar-BVI | Blackstone | $133,000,000 |
| 08/06/2012 - 09/20/2012 | Blackstone | Alsen Chance | $21,250,000 |
| 09/21/2012 | Alsen Chance | Swizz Beatz PI | $1,500,000 |

Id. ¶ 85, Table 2.

| Project Maximus | | | |
|---|---|---|---|
| **Date** | **Sending Party** | **Receiving Party** | **Amount** |
| 10/19/2012 | 1MDB | 1MDB Energy Langat | $1,640,000,000 |
| 10/19/2012 | 1MDB Energy Langat | Aabar-BVI | $790,354,855 |
| 09/10/2013 | Aabar-BVI | Affinity | $25,500,000 |
| 11/11/2013 | Affinity | Monza Studios | $800,000 |

Id. ¶ 89, Table 3.

**b. The Options Buyback Phase**

In the next phase of the 1MDB Fraud, 1MDB and its subsidiary 1MDB Energy Holdings Limited ("1MEHL") sought a series of loan facilities from Deutsche Bank for the purported purpose of buying back options that had previously been granted to Aabar UAE. AC ¶¶ 90-92. These loan proceeds were subsequently routed through Aabar-BVI and other companies, including "Alpha Synergy," a Seychelles-based company wholly owned by Low. Id. ¶¶ 93-96. Ultimately, a portion of the funds were deposited in Affinity's bank account. Id. ¶¶ 97, 103. Low and/or Tan then caused Affinity to transfer a portion of those funds to Dean. Id. ¶¶ 98, 104. These transactions are detailed in the charts below.

| Options Buyback – Chart 1 | | | |
|---|---|---|---|
| **Date** | **Sending Party** | **Receiving Party** | **Amount** |
| 05/26/2014 | Deutsche Bank | 1MEHL | $250,000,000 |
| 05/28/2014 | 1MEHL | Aabar-BVI | $175,000,000 |
| 05/30/2014 | Aabar-BVI | Affinity | $155,000,000 |
| 06/18/2014 | Aabar-BVI | Affinity | $19,000,000 |
| 06/18/2014 | Affinity | Alpha Synergy | $7,500,000 |
| 06/19/2014 | Affinity | Dean | $500,000 |
| 07/25/2014 | Alpha Synergy | Affinity | $2,950,000 |
| 07/25/2014 | Affinity | Dean | $300,000 |

Id. ¶ 99, Table 4.

| Options Buyback – Chart 2 | | | |
|---|---|---|---|
| **Date** | **Sending Party** | **Receiving Party** | **Amount** |
| 09/02/2014 | Deutsche Bank | Aabar Seychelles | $223,300,000 |
| 09/30/2014 | Deutsche Bank | Aabar Seychelles | $457,984,607 |
| 09/04/2014 | Aabar Seychelles | Affinity | $103,333,000 |
| 09/04/2014 | Affinity | Dean | $1,400,000 |

Id. ¶ 105, Table 5.

### c. The SRC Phase

In the next and final phase, SRC International obtained a series of loans from one of Malaysia's largest pension funds, purportedly to invest in the exploration and extraction of various natural resources. AC ¶ 106. It then transferred those funds through a series of BVI companies associated with 1MDB to a bank account owned by Affinity. Id. ¶¶ 107-12. Low and/or Tan caused Affinity to transfer a portion of those funds to Monza Studios, one of Dean's companies. Id. ¶ 111. These transactions are detailed in the chart below.

| SRC Phase | | | |
|---|---|---|---|
| **Date** | **Sending Party** | **Receiving Party** | **Amount** |
| 11/16/2011-<br><br>04/02/2014 | SRC International | SRC BVI | $1,119,486,500 |
| 12/20/2013 | SRC BVI | Pacific Rim | $12,193,878 |
| 12/24/2013 | Pacific Rim | Affinity | $11,950,000 |
| 12/26/2013 | Affinity | Monza Studios | $1,000,000 |

Id. ¶ 112, Table 6.

### d. Fraudulent Conveyance Allegations

All of the Insolvent Entities were "shell companies" controlled by the Insiders, and each "had no assets that generated revenue, board of directors, office space, address, or telephone number." AC ¶ 64. Furthermore, the Insolvent Entities "did not issue stock, kept no corporate records, and incurred debts while retaining no equity." Id. Instead, the Insolvent Entities were exploited by the Insiders for their "personal use" and used to launder funds that ultimately financed, "inter alia[,] the purchases of luxury residential real estate in the United States, artwork from New York City auction houses, and the funding of major Hollywood films." Id. ¶¶ 63-67.

As relevant here, plaintiffs allege that the transfers from the Debtors -- Affinity and Alsen Chance -- to defendants were for no consideration. Id. ¶¶ 114-23, 144-47, 153-56. Further,

plaintiffs allege that the Insiders made the transfers with "actual intent to hinder, delay or defraud" their creditors. Id. ¶ 148. Finally, plaintiffs allege that the fraudulent transfers were made when the Debtors were insolvent or, alternatively, that the Debtors became insolvent as a result of the transfers, id. ¶ 157; that the transfers were made at a time when the Debtors had "unreasonably small capital," id. ¶ 158; and that Low and Tan intended or believed that the Debtors would incur debts beyond their ability to pay, id. ¶ 159.

### III. The BVI Proceedings

The Insolvent Entities are all incorporated in the British Virgin Islands. AC ¶¶ 12, 16, 20, 24. As the 1MDB Scandal unfolded, three of the companies were removed from the "register" of BVI companies by the BVI government, and all four were placed into liquidation proceedings (the "BVI Proceedings"). Id. ¶¶ 5-6, 13, 17, 21. In the BVI Proceedings, the Caribbean Supreme Court, British Virgin Islands, High Court of Justice Commercial Division ("BVI Court") appointed plaintiffs as liquidators of each of the Insolvent Entities under the BVI Insolvency Act 2003 (the "Insolvency Act") and restored three of the companies to the "register." Id. ¶¶ 4-7, 11, 13, 17, 21, 25. Pursuant to the Insolvency Act, the Liquidators have the power to manage the affairs of the Insolvent Entities, commence legal actions on their behalf, and distribute any recovered funds to their creditors.

Id. ¶¶ 7-10.  The Liquidators have sought and received recognition as Chapter 15 foreign debtors under the U.S. Bankruptcy Code on behalf of each of the Insolvent Entities.[5]  Id. ¶¶ 14-15, 18-19, 22-23, 26-27; see also 11 U.S.C. §§ 1504, 1515, 1517.

## PROCEDURAL HISTORY

Plaintiffs filed this action on October 2, 2024.  ECF No. 1.  The Court endorsed a joint stipulation to extend the time to respond on November 6, 2024.  ECF No. 11.  On December 30, 2024, plaintiffs filed the Amended Complaint, alleging (i) actual fraudulent conveyance under DCL §§ 276 and 276-a, (ii) constructive fraudulent conveyance under DCL §§ 273-75, and (iii) unjust enrichment.  ECF No. 20.  On February 20, 2025, defendants moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 25.

## LEGAL STANDARDS

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  Id.  However,

---

[5]    See In re: Affinity Equity Int'l Partners Ltd., No. 22-16815 (Bankr. S.D. Fla.); In re: Alsen Chance Holdings Ltd., No. 24-11465 (Bankr. S.D. Fla.); In re: Aabar Investments PJS, No. 22-16802 (Bankr. S.D. Fla.); In re: Blackstone Asia Real Estate Partners Limited, No. 22-16805 (Bankr. S.D. Fla.).

courts must still "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Carter v. HealthPort Techs., LLC, 822 F.3d 47, 57 (2d Cir. 2016) (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)). "The task of the district court is to determine whether the Pleading allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." Id. at 56 (citation and internal quotation marks omitted).

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A court must "accept[] as true all factual allegations in the complaint and draw[] all reasonable inferences in [plaintiff's] favor[.]" Acticon AG, 692 F.3d at 37. "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[.]'" Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678). In evaluating the sufficiency of a complaint, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the

complaint." <u>DiFolco v. MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d Cir. 2010).

## DISCUSSION

Defendants move to dismiss on the grounds that (i) the constructive fraudulent conveyance and unjust enrichment claims are time-barred, (ii) plaintiffs lack standing under the DCL, <u>Wagoner</u> rule, and <u>in pari delicto</u> doctrine, and (iii) the Amended Complaint pleads insufficient facts to state a claim. We consider each of these issues in order.

### I.   Statute of Limitations

We begin by addressing the statute of limitations arguments raised by defendants. Defendants argue that the six-year statute of limitations applicable to both the constructive fraudulent conveyance claim and the unjust enrichment claim has run because the last alleged fraudulent transfer occurred on September 4, 2014.[6] Mot. at 14-16; <u>see</u> CPLR 213(1). Plaintiffs point out that 11 U.S.C. § 108(a) tolls the statute of limitations available to an insolvent company for two years after any "order of relief," including a Chapter 15 recognition order. Opp. at 16-17; <u>see</u> <u>supra</u> pp. 13. However, as defendants correctly observe, the Liquidators and the Insolvent Entities were not recognized in the United States until after 2020. ECF No. 35 ("Reply") at 8.

---

[6]   It is undisputed that plaintiffs' claim for actual fraudulent conveyance pursuant to DCL § 276 is timely. <u>See</u> ECF No. 27 ("Mot.") at 2, 14; ECF No. 33 ("Opp.") at 16.

Plaintiffs cite the "adverse domination" doctrine in an effort to bridge this gap, arguing that because Low and the Insiders controlled the Insolvent Entities until May 2018, the claims remain timely. See Opp. at 16-17 (citing AC ¶¶ 3, 129). The adverse domination rule tolls the statute of limitations "for as long as a corporate plaintiff is controlled by the alleged wrongdoers," Levin v. Nirav Deepak Modi (In re Firestar Diamond, Inc.), 634 B.R. 265, 294 (Bankr. S.D.N.Y. 2021), meaning that the statute of limitations would not begin to run until May 2018 and the claims would be timely when considered together with Section 108(a), see Opp. at 17, Table 2.

Defendants respond that (1) CPLR 213 is a "statute of repose," and (2) adverse domination is a "federal common law theory" inapplicable to New York state law claims. Reply at 7-9. However, defendants, by their own admission, fail to cite any case law applying their "statutes of repose" argument to CPLR 213, the relevant statute of limitations. See Mot. at 9 (admitting that "the authorities neglect to cite CPLR [] 213"). Although the Court recognizes that one of the goals of statutes of limitations is to "bar[] stale claims," Ely-Cruikshank Co. v. Bank of Montreal, 81 N.Y.2d 399, 404 (1993), this does not trump clear precedent, see infra pp. 19-20, that fraudulent conveyance and unjust enrichment claims may be tolled when adverse domination is sufficiently alleged.

Despite defendants' argument that the "adverse domination" doctrine is a creature of federal law, Reply at 7-8, there is support for the view that it has been adopted by New York courts. "Under the general rule, to which New York has apparently adhered, . . . the statute is tolled while the corporate plaintiff continues under the domination of the wrongdoers." Banco De Desarrollo Agropecuario, S.A. v. Gibbs, 709 F. Supp. 1302, 1310 (S.D.N.Y. 1989) (quoting Michelson v. Penney, 135 F.2d 409, 415 (2d Cir. 1943)); cf. F.D.I.C. v. Pelletreau & Pelletreau, 965 F. Supp. 381, 388 (E.D.N.Y. 1997) ("not[ing] disagreement in the case law as to the applicability of the adverse domination tolling theory in New York").[7]

Plaintiffs allege that "Low controlled the Debtors' bank accounts by way of his proxy, Eric Tan." AC ¶ 42. Tan "was the named beneficial owner of several bank accounts . . . traceable to 1MDB . . . , including those of [Alsen Chance, Affinity,] and Blackstone." Id. ¶ 46. Low's associates, Al-Husseiny and Al Qubaisi, similarly were "beneficial owners of . . . Aabar-BVI."

---

[7]    Even assuming, arguendo, that the adverse domination rule did not apply, there are other, similar state law doctrines, such as equitable tolling or equitable estoppel, which could apply in this context.  While plaintiffs' allegations that Dean was friends with Low, AC ¶¶ 38-41, that 1MDB was international news since at least 2015, id. ¶ 136-38, that Dean received and agreed to relinquish a Warhol print gifted to him by Low, id. ¶¶ 41, 138-39, and that Dean "knew or should have known" the transfers were fraudulent, id. ¶ 135, do not necessarily evince a conscious effort to "lull the other party into delay," further facts may emerge in discovery. Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia, 23 F. Supp. 2d 439, 447 (S.D.N.Y. 1998) (discussing equitable tolling and equitable estoppel under New York law).

Id. ¶ 53.  In addition, plaintiffs allege that all the Insolvent Entities were "shell companies" with "no assets that generated revenue, board of directors, office space, address, or telephone number," and they "did not issue stock, kept no corporate records, and incurred debts while retaining no equity."  Id. ¶ 64.  Further, plaintiffs assert that from their respective positions, "[t]he Insiders dominated and controlled the Debtors and Creditors until at least [May] 2018," when Najib was ousted from his positions in Malaysia and indicted.  Id. ¶¶ 3, 129-30; see also Opp. at 17.

Where, as here, domination and control of the Insolvent Entities has been properly alleged, it is inappropriate to preclude claims on statute of limitations grounds on a motion to dismiss. See Banco De Desarrollo Agropecuario, S.A., 709 F. Supp. at 1310 ("[Plaintiff's] allegations of control and wrongdoing are sufficient to withstand the present motion [to dismiss]."); Meridien Int'l Bank Ltd. 23 F. Supp. 2d at 447-48 ("Until the issues of domination and control, which are fact based, are more fully litigated, the statute of limitations must be deemed not to have expired" and "must be tolled during [the wrongdoer's] period of control."); In re Everfresh Beverages, Inc., 238 B.R. 558, 577-78 (Bankr. S.D.N.Y. 1999) (holding that where "Plaintiffs allege . . . that the Debtors were dominated and controlled by the Defendants . . . [and] that the Debtors' assets were wrongfully shifted . . . [t]hese allegations are sufficient . . . to defeat

a motion to dismiss based upon timeliness"); <u>Levitt v. Riddell Sports, Inc. (In re MacGregor Sporting Goods, Inc.)</u>, 199 B.R. 502, 515 (Bankr. D.N.J. 1995) (finding that "[t]he tolling principle[] of . . . adverse domination involve[s] questions of fact which cannot be resolved as a matter of law on a motion to dismiss").

Finally, any discovery into these claims will not be substantially different and no greater than discovery arising from the indisputably timely actual fraudulent conveyance claim. <u>See Yurman Design Inc. v. Chaindom Enters., Inc.</u>, No. 99 Civ. 9307 (JFK), 2001 WL 725291, at *4 (S.D.N.Y. June 27, 2001) (finding that defendants were not prejudiced by additional claims because the "claims would mirror" each other and "discovery . . . would not be unduly burdensome"). For these reasons, the Court finds that plaintiffs' constructive fraudulent conveyance and unjust enrichment claims are not time-barred.

## II. Standing

Defendants argue pursuant to Rule 12(b)(1) that plaintiffs lack standing to bring fraudulent transfer claims because (i) plaintiffs do not represent "creditors" as required by the DCL, and (ii) plaintiffs' claims are barred by the <u>Wagoner</u> rule and the related <u>in pari delicto</u> doctrine. We consider each of these issues in turn.

### a. DCL Standing

We begin by addressing defendants' argument that plaintiffs lack standing under the DCL. See Mot. at 7-10; Reply at 2-4. "It is well settled that in order to set aside a fraudulent conveyance [pursuant to the DCL], one must be a creditor of the transferor; those who are not injured by the transfer lack standing to challenge it." Eberhard v. Marcu, 530 F.3d 122, 131-35 (2d Cir.2008) (citing DCL § 276). However, in the narrow situation where a liquidator is appointed to act on behalf of an insolvent company or group of companies, "standing to bring a fraudulent conveyance claim [under the DCL] will turn on whether [1] [the liquidator] represents the transferor only or [2] also represents a creditor of the transferor." Eberhard, 530 F.3d at 133; see also Cobalt Multifamily Inv'rs I, LLC v. Arden, 46 F. Supp. 3d 357, 362-63 (S.D.N.Y. 2014); SEC v. Shiv, 379 F. Supp. 2d 609, 618 (S.D.N.Y. 2005); Friedman v. Wahrsager, 848 F. Supp. 2d 278, 290 (E.D.N.Y. 2012); Fed. Nat. Mortg. Ass'n v. Olympia Mortg. Corp., No. 04 Civ. 4971 (NG) (MDG), 2011 WL 2414685, at *7 (E.D.N.Y. June 8, 2011); accord Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995) (Posner, J.).

Here, because two of the four companies represented by the Liquidators are "creditors of the transferor[s,]" plaintiffs have

standing under the DCL.[8]  The Liquidators represent two groups of companies: (1) Alsen Chance and Affinity (the "Debtors"), and (2) Aabar-BVI and Blackstone (the "Creditors").  Under the DCL, a "creditor" is "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."  DCL § 270.  Aabar-BVI and/or Blackstone transferred funds to Alsen Chance and/or Affinity for no consideration <u>before</u> Alsen Chance and Affinity fraudulently transferred funds to defendants, again for no consideration.  <u>See</u> AC ¶¶ 85, Table 2, 89, Table 3, 99, Table 4.  Therefore, Aabar-BVI and Blackstone are "creditors" of the transferors pursuant to the DCL.[9]  <u>See</u> <u>Drenis</u> <u>v. Haligiannis</u>, 452 F.Supp.2d 418, 428 (S.D.N.Y. 2006) ("Under New York's broad definition of 'creditor,' one who has a right to maintain a[n] . . . action but has not recovered judgment at the

---

[8]    Defendants make the argument that the Court's standing analysis must independently address the Liquidators' standing as to the Debtors, Alsen Chance and Affinity, and the Creditors or "Purported Creditors," Blackstone and Aabar-BVI.  <u>See</u> Mot. at 7 ("[T]he Liquidators' standing must be independently evaluated in their capacity as liquidators of the Debtors and the Purported Creditors.").  We do not agree.  The Court must examine not the standing of the insolvent companies individually, but rather the standing of the Liquidators appointed over all of them.  <u>See</u> <u>Friedman</u>, 848 F. Supp. 2d at 289-90 (recognizing the standing of appointed representative under the DCL, without bifurcating the analysis, where the representative was appointed over both the transferor and two businesses that were creditors of the transferor).

[9]    Defendants' argument that Aabar-BVI and Blackstone are merely "Purported Creditors" and that plaintiffs have failed to plead they are, in fact, creditors of the Debtors is unavailing.  Mot. at 2, 10.  Plaintiffs' pleading goes far beyond simply defining the insolvent companies as "Creditors" or "Debtors."  It also lists the date, amount, sender, and recipient for each transfer from Aabar-BVI and/or Blackstone to Alsen Chance and/or Affinity and alleges that these transfers were for no consideration.  <u>See</u> AC ¶¶ 85, Table 2, 89, Table 3, 99, Table 4; <u>see also</u> <u>id.</u> ¶ 70.  This is more than sufficient to establish that Aabar-BVI and Blackstone are "creditors" for the purposes of standing.  <u>See</u> DCL § 270.

time of the transfer is a creditor [from] the moment the cause of action accrues."); Friedman, 848 F. Supp. 2d at 290 (finding that where a receiver represented both the creditor "Corporate Guarantors" and transferor/debtor "NYMP," "[t]hough the Corporate Guarantors have not yet asserted a secondary claim against NYMP . . ., the expansive definition of creditor under DCL § 270, which includes 'any claim . . . fixed or contingent,' nevertheless qualifies them as creditors of NYMP, and confers standing on the Receiver to bring fraudulent conveyance claims on their behalf").

Likewise, if the Insiders, who controlled both the Creditors and the Debtors when the transfers were made, are rightly considered the "transferors," all four Insolvent Entities may properly be considered "creditors" pursuant to the DCL, regardless of whether the transfers passed through Aabar-BVI or Blackstone. See AC ¶¶ 105, Table 5, 112, Table 6. Where "the [plaintiffs] bring[] suit on behalf of the [insolvent] entities" and "these entities are . . . creditors" of the wrongdoing transferor, "the [plaintiffs] ha[ve] standing." Armstrong v. Collins, No. 01 Civ. 2437 (PAC), 2010 WL 1141158, at *19-21, 33 (S.D.N.Y. Mar. 24, 2010); see also Cobalt, 46 F. Supp. 3d at 362-63; U.S. Small Bus. Admin. v. Ameritrans Holdings, LLC, No. 20 Civ. 1166 (JS)(SIL), 2021 WL 7908051, at *9 (E.D.N.Y. June 15, 2021), report and recommendation adopted, 2024 WL 704621 (E.D.N.Y. Feb. 21, 2024); Carney v. Montes, No. 12 Civ. 183 (SRU), 2014 WL 671263, at *9 (D.

Conn. Feb. 21, 2014).  In sum, either the Debtors or the dominating Insiders may properly be considered the transferors, and under either framing plaintiffs have standing as "creditors."

Defendants devote much of their opening memorandum of law to an irrelevant question of foreign law.  Specifically, defendants argue that: (i) the standing of a foreign liquidator recognized under Chapter 15 of the Bankruptcy Code hinges on whether BVI law vests liquidators with the authority to bring claims on behalf of creditors[10]; (ii) BVI law does not grant liquidators such authority; and, consequently, (iii) plaintiffs cannot meet the DCL requirement that "one must be a creditor of the transferor."  Mot. at 7-10.  The parties have submitted dueling expert reports on BVI

---

[10]    Domestic trustees appointed to represent an insolvent debtor under Chapter 11 of the Bankruptcy Code are empowered to bring fraudulent transfer claims on behalf of creditors even if they are not also appointed to represent the creditors of the debtor.  11 U.S.C. § 544(b) (A trustee may "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable . . . by a creditor holding an unsecured claim[.]").  By contrast, while Chapter 15 foreign representatives are granted the protection of many provisions of the Bankruptcy Code, they are not allowed to invoke certain provisions, including Section 544(b).  See 11 U.S.C. § 1521(a)(7) ("[T]he court may, at the request of the foreign representative, grant any appropriate relief, . . . except for relief available under section[] . . . 544[.]").  This distinction arises from comity concerns -- the desire to show due respect and consideration for foreign jurisdictions -- where the law of the foreign debtor's home country may not grant trustees, liquidators, receivers, etc. with equivalent powers.  Thus, where a foreign representative represents only a debtor, they must demonstrate that the foreign law would empower them to bring claims on behalf of creditors in an equivalent way to Section 544(b).  See In re Hellas Telecommunications (Luxembourg) II SCA, 524 B.R. 488, 523-24 (Bankr. S.D.N.Y.), adhered to, 526 B.R. 499 (Bankr. S.D.N.Y. 2015) ("The [Chapter 15] Plaintiffs' standing, then, turns on whether [foreign] law vests the Plaintiffs, as liquidators, with the authority to assert causes of action on behalf of the Debtor's creditors.") (citing Koreag, Controle et Revision S.V. v. Refco F/X Assocs., 961 F.2d 341, 348 (2d Cir. 1992)).

law opining on whether, as defendants' expert puts it, "[u]nder the laws of the BVI, . . . the liquidator of a [debtor] company ha[s] the power to bring claims that belong to the creditors of the company." ECF No. 26 (Declaration of Andrew Thorp) at 3; see also ECF No. 32 (Declaration of Tameka Davis); ECF No. 36 (Reply Declaration of Andrew Thorp).

The Court does not –- and need not –- reach this question. It is undisputed that the Liquidators have authority under BVI law to bring claims directly held by the companies they are appointed to represent. See Mot. at 8 (conceding that "the Liquidators are charged with collecting and distributing the assets of a company to creditors; and may bring a BVI law governed fraudulent transfer claim," while disputing only whether "such authority is . . . sufficient to vest the Liquidators with the authority to act on behalf of a creditor" they do not represent) (emphasis in original). Because the Liquidators are empowered by BVI law to bring claims on behalf of the companies they directly represent, id., and because some of the companies they represent are "creditors of the transferor[s]," Eberhard, 530 F.3d at 133, the Liquidators have standing as "creditors" under the DCL.

Indeed, defendants' own cases recognize that Chapter 15 representatives "have standing to pursue fraudulently conveyed assets [under the DCL] . . . when one of the [represented] entities . . . is a creditor of the transferor." In re Hellas, 524 B.R. at

521 (citation and internal quotation marks omitted); see also
Barnet v. Drawbridge Special Opportunities Fund LP, No. 14 Civ.
1376 (PKC), 2014 WL 4393320, at *16 (S.D.N.Y. Sept. 5, 2014)
(finding that plaintiffs lacked DCL standing only because "they
appear in this action in their capacity as liquidators of the . .
. estate and not as representatives of any creditors of the
estate") (emphasis added).   The court in In re Hellas, which
analyzed "whether U.K. law vests the Plaintiffs, as liquidators,
with the authority to assert causes of action on behalf of the
Debtor's creditors," acknowledged that it only needed to undertake
such foreign law analysis because none of the companies the
liquidators represented were "creditors of the Debtor."  524 B.R.
at 522-23 (eventually concluding that U.K. law did not vest a
debtor's representative with the power to bring fraudulent claims
on behalf of creditors).   This case presents no such dilemma
because the Liquidators "also represent[] a creditor of the
transferor."  Eberhard, 530 F.3d at 133.

Defendants also argue, for the first time in their reply,
that Eberhard is inapplicable because it concerned "receivers"
rather than "liquidators" and "[l]iquidators and receivers have
separate . . . roles and disciplines: a liquidator winds up a
company, selling assets to repay creditors and shareholders; a
receiver manages and sells assets pledged as security for a debt,
primarily to repay a secured creditor."  Reply at 2.   Defendants

fail to articulate how this distinction is germane. First, the Eberhard court pointed out that receivers have _fewer_ powers than liquidators. Eberhard, 530 F.3d at 132 ("[T]he power of a securities receiver is not without limits[;] [f]or example, we have expressed strong reservations as to the propriety of allowing a receiver to liquidate" an insolvent company.). It is unclear why a liquidator would have _less_ power to avoid fraudulent transfers on behalf of creditors than a receiver, despite having _greater_ power to distribute the assets of an estate for the benefit of those creditors. Second, the Eberhard court's discussion of receivers' powers was focused on the concept that "the plaintiff in his capacity of receiver has no greater rights or powers than the corporation itself would have." Id. (citing Fleming v. Lind-Waldock & Co., 922 F.2d 20, 25 (1st Cir. 1990)). This was the premise for the court's conclusion that a receiver appointed to "represent[] the transferor only" should not be able to bring a fraudulent transfer claim under the DCL. Eberhard, 530 F.3d at 133. However, where, as here, the plaintiffs "also represent[] a creditor of the transferor[s]," id., this is a distinction without a difference.

### b. The **Wagoner** Rule and **In Pari Delicto** Doctrine

We turn next to defendants' argument, Mot. at 10-13, that plaintiffs lack standing under the Wagoner rule, which states that "when a bankrupt corporation has joined with a third party in

defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir. 1991). Wagoner is a prudential standing requirement that "derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." Wight v. BankAmerica Corp., 219 F.3d 79, 86–87 (2d Cir. 2000).

Defendants also cite to the in pari delicto doctrine, Mot. at 10-13, a common law doctrine "mandat[ing] that the courts will not intercede to resolve a dispute between two wrongdoers." Kirschner v. KPMG LLP, 15 N.Y.3d 446, 464 (2010). "In pari delicto is a state law equitable defense analogous to unclean hands 'rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct.'" In re Food Mgmt. Grp., LLC, 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008) (quoting Pinter v. Dahl, 486 U.S. 622, 632 (1988)). "The doctrine survives because it serves important public policy purposes[:] First, denying judicial relief to an admitted wrongdoer deters illegality[;] Second, in pari delicto avoids entangling courts in disputes between wrongdoers." In re Optimal U.S. Litig., 813 F. Supp. 2d 383, 395 (S.D.N.Y. 2011).

"Other than the fact that the Wagoner rule is characterized as a standing rule, whereas 'in pari delicto' is an equitable

defense, no Second Circuit case suggests a distinction between the two rules[.]" Glob. Crossing Est. Representative v. Winnick, No. 4 Civ. 2558 (GEL), 2006 WL 2212776, at *12 (S.D.N.Y. Aug. 3, 2006) (collecting cases).  Therefore, our analysis of the Wagoner rule and the in pari delicto doctrine is identical.

### i.  The Applicability of Wagoner and In Pari Delicto

The Wagoner rule and in pari delicto doctrine do not apply here.  As Judge Richard A. Posner of the Seventh Circuit has explained,

> [Although] the wrongdoer must not be allowed to profit from his wrong . . . [t]hat reason falls out now that [the wrongdoer] has been ousted from control of and beneficial interest in the corporations.  The appointment of the [liquidator] removed the wrongdoer from the scene.  The corporations were no more [the wrongdoer's] evil zombies.  Freed from his spell they became entitled to the return of the moneys -- for the benefit not of [the wrongdoer] but of innocent investors [and creditors] -- that [the wrongdoer] had made the corporations divert to unauthorized purposes.
>
> . . .
>
> Put differently, the defense of in pari delicto loses its sting when the person who is in pari delicto is eliminated.

Scholes, 56 F.3d at 754.  The Second Circuit has adopted Judge Posner's position.  See Eberhard 530 F.3d at 132-33 ("'The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more [the wrongdoer's] evil zombies. Freed from his spell they became entitled to the return of the moneys . . . that [the wrongdoer] had made the corporations divert

to unauthorized purposes.'") (quoting Scholes, 56 F.3d at 754).
As our sister courts have recognized, "the Eberhard Court adopted
Scholes, thereby establishing an exception to the Wagoner rule[:]
In the Second Circuit, when transfers are made by a corporation
that is dominated by the wrongdoer, a receiver appointed to recover
assets for the receivership entity -- rather than for a wrongdoer
who manipulated the dominated entity -- has standing to bring
claims on the corporation's behalf." Montes, 2014 WL 671263, at
*9; accord Cobalt, 46 F. Supp. 3d at 364 (Where an appointed
representative "represents the corporate entities used by the
[wrongdoers] to perpetrate their scheme[ the representative] . .
. has standing to bring claims to recover the alleged fraudulent
transfers from the entities for which he was appointed, and he is
not barred from doing so by in pari delicto or Wagoner.") (citing
Eberhard, 530 F.3d at 132–34; Scholes, 56 F.3d at 753–54).

In this case, Low and the other Insiders are currently either
fugitives or serving jail sentences and have been removed from
ownership, management, or any other involvement with Aabar-BVI,
Blackstone, Alsen Chance, and Affinity. AC ¶¶ 3-11, 44, 47, 50,
54. In their place, the Liquidators have been appointed by the
BVI Court and recognized in the United States under Chapter 15.
Id. ¶¶ 12-27. Now that the "zombie corporations" are no longer
the Insiders' "robotic tools," "the [the Liquidators'] only object
[is] to maximize the value of the corporations for the benefit of

. . . creditors." <u>Eberhard</u>, 530 F.3d at 132-33 (citation and internal quotation marks omitted).  Defendants concede that this is precisely the function of the Liquidators here.[11]

With respect to the <u>Wagoner</u> rule, plaintiffs assert that, in general, "avoidance actions do not fall within the <u>Wagoner</u> rule." Opp. at 14 (quoting <u>Wansdown Props. Corp. N.V. v. Azari</u>, 647 B.R. 23, 40 (Bankr. S.D.N.Y. 2022)).  Defendants respond that plaintiffs' cases on this point are inapposite, as they all involve traditional Chapter 11 trustees, who are vested with the authority to pursue claims on behalf of creditors by Section 544(b) of the Bankruptcy Code.  Reply at 3; <u>see also</u> <u>supra</u> pp. 24 n.10. Defendants are correct that Chapter 15 foreign representatives like the Liquidators, while vested with some powers under the Bankruptcy Code, are not granted authority to avoid transfers on behalf of creditors unless the law of their home country would afford such powers.  <u>See</u> 11 U.S.C. § 1521(a)(7) (specifically exempting Section 544(b) from the list of powers inherent to foreign representatives).

---

[11]    Although defendants dispute whether the Liquidators have standing to pursue a claim, Mot. at 7-10, they do not dispute that "the Liquidators are charged with collecting and distributing the assets of a company to creditors," <u>id.</u> at 8.  Put simply, any funds that the Liquidators do "collect" would indisputably be distributed to creditors who appear in the BVI Proceedings. <u>See</u> AC ¶¶ 7-13.  This is precisely the result envisioned by the <u>Eberhard</u> and <u>Scholes</u> courts in such a situation, <u>Eberhard</u>, 530 F.3d at <u>132-33</u>, and underscores why any differences between liquidators and receivers writ large are not germane to the dispute here.  <u>See</u> <u>supra</u> pp. 26-27.

However, because the Liquidators here are <u>also</u> representatives of several creditors, <u>Eberhard</u>, 530 F.3d at 133, and indisputably possess the ability to "collect and distribute" any assets recovered for the benefit of additional creditors, Mot. at 8, the reasons courts do not apply the <u>Wagoner</u> rule to avoidance claims brought under Chapter 11 may still be informative.  "As Judge Lane concluded in a recent decision, an unclean hands defense is a 'poor fit' where the trustee 'seeks to recover the funds for the benefit of creditors of the estate, not for the benefit of [a wrongdoing director.]'"  <u>In re Wansdown Props. Corp. N.V.</u>, 647 B.R. at 40 (quoting <u>LaMonica v. NEDM Payables Corp.</u>, 644 B.R. 298, 309 (Bankr. S.D.N.Y. 2022)); <u>see also</u> <u>In re Wedtech Corp.</u>, 88 B.R. 619, 622 (Bankr. S.D.N.Y. 1988) ("[A] trustee's ability to obtain a recovery for an estate and its blameless creditors may not be denied by the pre-petition wrongful conduct of the debtor.").  This is the same rationale elucidated by <u>Eberhard</u> and its progeny, that when corporations dominated by a wrongdoer are "[f]reed from his spell they became entitled to the return of the [fraudulently transferred] moneys . . . for the benefit of . . . creditors." <u>Eberhard</u> 530 F.3d at 132–33 (citation and internal quotation marks omitted).

### ii.  Adverse Interest Exception

Plaintiffs argue that even if the <u>Wagoner</u> rule or <u>in pari delicto</u> doctrine were applicable, the adverse interest exception

would apply.  Opp. at 15-16.  "Under New York law, the adverse interest exception rebuts the usual presumption that the acts and knowledge of an agent acting within the scope of employment are imputed to the principal."  In re Mediators, Inc., 105 F.3d 822, 827 (2d Cir. 1997) (citing Center v. Hampton Affiliates, 66 N.Y.2d 782, 784 (1985)).  The exception applies when an agent has "totally abandoned his principal's interests and [is] acting entirely for his own or another's purposes."  Hampton Affiliates, Inc., 66 N.Y.2d at 785.  Where a complaint pleads that plaintiff "was adversely dominated by corrupt management, who, acted in their own interests and not in the interests of [plaintiff] . . . the complaint [has] pled facts sufficient to trigger the adverse interest exception."  Wight, 219 F.3d at 87 (cleaned up); see also id. (noting that "for purposes of [defendant's] Rule 12 motion, the district court correctly construe[d] the complaint in favor of the Liquidators and credited their adverse interest allegation as true") (citation and internal quotation marks omitted).

Here, plaintiffs plead that "[t]he Insiders dominated and controlled the Debtors and Creditors until at least 2018."  AC ¶ 3; see also supra pp. 12, 19.  They likewise plead that the "Insider-managers only transacted funds through the Debtors and Creditors' bank accounts for their personal use," and that the companies either "were" or "became insolvent as a result" of the fraudulent transfers.  AC ¶¶ 65, 157.  Therefore, even if the

_Wagoner_ rule or _in pari delicto_ doctrine were applicable, the adverse interest exception would apply.

Defendants argue on reply that the "sole actor" exception to the adverse interest exception applies.  Reply at 7.  The "sole actor" rule "imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal."  _In re Mediators, Inc._, 105 F.3d at 827. In other words, "the adverse interest exception does not apply to cases in which the principal is a corporation and the agent is its sole shareholder."  _Id._  Defendants point to plaintiffs' allegation that "the Debtors and Creditors had no . . . board of directors," as proof the "sole actor" rule applies.  Reply at 7 (quoting AC ¶ 64).

The "sole actor" exception does not change our determination for three reasons.  First, the cases cited by defendants apply the "sole actor" rule to "aiding and abetting" causes of action for damages, rather than fraudulent conveyance claims.  _See, e.g._, _In re ICP Strategic Credit Income Fund Ltd._, No. 13-12116 (REG), 2015 WL 5404880, at *2 (Bankr. S.D.N.Y. 2015) (bringing damages claims for "(1) aiding and abetting fraud [and] (2) aiding and abetting breaches of fiduciary duty"); _In re Bernard L. Madoff Inv. Sec. LLC._, 721 F.3d 54, 58 (2d Cir. 2013) ("breach of fiduciary duty, aiding and abetting fraud"); _In re Mediators, Inc._, 105 F.3d at

825-28 (considering "aiding and abetting a fiduciary's breach of duty" and upholding dismissal of a Section 544(b) fraudulent conveyance claim on statute of limitations grounds).

Second, at the motion to dismiss stage we must construe the facts in plaintiffs' favor. While the Amended Complaint acknowledges that Low and Tan were the "sole operators and beneficial owners" of Alsen Chance and Affinity, AC ¶ 148(c), it is less clear whether Aabar-BVI and Blackstone were wholly owned by the Insiders, id. ¶¶ 46, 53. "[O]n a motion to dismiss, an allegation of adverse interest should be credited as true, and . . . '[the] question of whether the guilt of the corporate officers can be imputed to the corporation' should be decided on an evidentiary record and not disposed of on the pleadings." In re Monahan Ford Corp. of Flushing, 340 B.R. 1, 25-26 (Bankr. E.D.N.Y. 2006) (quoting Wight, 219 F.3d at 87).

Lastly, the adverse interest and sole actor issue are irrelevant in light of the clear precedent from Eberhard and Scholes that even if "[t]he corporations were . . . [the wrongdoer's] evil zombies," once they are "freed" liquidators may recover fraudulent conveyance claims on their behalf. See Eberhard 530 F.3d at 132-33 (wrongdoer was "sole shareholder" of the company); Scholes 56 F.3d at 754 (same); see also Cobalt, 46 F. Supp. 3d at 364 (Where the liquidator "represents the corporate entities used by the [wrongdoer] to perpetrate their scheme . . .

[he] has standing to bring claims to recover the alleged fraudulent transfers from the entities for which he was appointed, and he is not barred from doing so by <u>in pari delicto</u> or <u>Wagoner</u>.").

In sum, the Court finds that plaintiffs have standing to bring their claims and that the Court has subject-matter jurisdiction to hear them.

### III. Sufficiency of the Pleadings

Defendants also argue pursuant to Rule 12(b)(6) that the Amended Complaint fails to state a claim as to (i) actual fraudulent conveyance, (ii) constructive fraudulent conveyance, and (iii) unjust enrichment. We will review the sufficiency of the pleadings seriatim.

### a. Actual Fraudulent Conveyance

Defendants contend that plaintiffs have failed to plead actual fraudulent conveyance. Mot. at 16-20; Reply at 9-11. Section 276 of the DCL provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." DCL § 276. [12] Although plaintiffs have pleaded

---

[12]    Plaintiffs also bring a claim for attorneys' fees under DCL § 276-a. AC ¶ 149. "Because the [plaintiffs] ha[ve] stated a claim for actual fraudulent transfer under § 276, the claim for attorney's fees is not ripe for determination in connection with [defendants'] motion to dismiss since plaintiff must succeed on the actual fraudulent transfer claim at trial." <u>Thaler v. Korn</u>, No. 13 Civ. 3768 (SJF), 2014 WL 1154059, at *7 (E.D.N.Y. Mar. 19, 2014). "Accordingly, [defendants'] motion to dismiss plaintiffs' claim for attorney's fees is denied

that the transfers were made when Affinity and Alsen Chance were insolvent or that the transfers made them insolvent, "a cause of action [under Section 276] may lie even where fair consideration was paid and where the debtor remains solvent." Grumman Aerospace Corp. v. Rice, 199 A.D.2d 365, 366 (2d Dep't 1993).

"The text of []DCL § 276 . . . compel[s] the conclusion that it is the transferor's intent alone, and not the intent of the transferee, that is relevant under NYDCL § 276." In re Dreier LLP, 452 B.R. 391, 432–33 (Bankr. S.D.N.Y. 2011). Put simply, it is the intent of the Insiders that must be pleaded, not the intent of Dean or his companies. "Because direct proof of actual intent is rare, creditors may rely on 'badges of fraud' to establish an inference of fraudulent intent." Shelly v. Doe, 249 A.D.2d 756, 758 (3d Dep't 1998) (citation and internal quotation marks omitted). "Factors that are considered 'badges of fraud' are (1) a close relationship between the parties to the transaction, (2) a secret and hasty transfer not in the usual course of business, (3) inadequacy of consideration, (4) the transferor's knowledge of the creditor's claim and his or her inability to pay it, (5) the use of dummies or fictitious parties, and (6) retention of control of the property by the transferor after the conveyance." Id. (citation omitted).

---

without prejudice to renew," if warranted, "after the DCL § 276 claim is decided." Id.

Importantly, "[b]ecause a claim under [DCL] § 276 requires proof of intent to defraud, it must be pled with particularity as required by Fed. R. Civ. P. 9(b)." Amusement Indus., Inc. v. Midland Ave. Assocs., LLC, 820 F. Supp. 2d 510, 530 (S.D.N.Y. 2011). Under this rule, "[c]ourts have dismissed intentional fraudulent conveyance claims where the complaint did not provide particulars or 'specify the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, or the consideration paid.'" Id. at 531 (quoting United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002)). However, Rule 9(b) allows that "'[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally,'" and so "it is not necessary to plead the 'badges of fraud' with particularity," Id. (quoting Fed. R. Civ. P. 9(b)); see also In re Tronox Inc., 429 B.R. 73, 94 (Bankr. S.D.N.Y. 2010) (same).

Here, plaintiffs have pleaded specific facts sufficient to allege actual fraudulent conveyance. There are numerous "badges of fraud" contained within the pleadings. See Shelly, 249 A.D.2d at 758. First, the Amended Complaint details the "close relationship" between Dean and Low, AC ¶¶ 38-41, a relationship so close that Low gifted Dean an Andy Warhol print valued at $1 million, id. ¶¶ 41, 138-39. Second, it details "secret and hasty transfers," in which funds raised for legitimate investment

purposes were rapidly diverted and then made their way through various "shell entities" without "boards of directors" or "office space" to the defendants.    Id. ¶¶ 71-112.   Third, it alleges "inadequacy of consideration."[13]    Id. ¶¶ 70, 113-23.   Fourth, it details "the transferor's knowledge of the creditor's claim and his or her inability to pay it."   The transfers from Aabar-BVI and Blackstone were ordered by one or multiple of the Insiders, id. ¶¶ 83-84, 87-88, 98, 104, 113-23, and the flight of Low and Tan from Malaysia, shortly after the transactions and shortly before 1MDB began defaulting on its debts, suggests knowledge of insolvency as to some or all of the Insolvent Entities, id. ¶ 126.   While there are fewer indications that the Insiders used "dummies" or "retained control" after the conveyances, not every "badge of fraud" need exist for a claim to be sufficiently pled.

It is also noteworthy that the 1MDB Scandal is an infamous case involving billions of dollars in stolen funds, numerous co-conspirators, and countless criminal and civil investigations

---

[13]    Defendants observe that one of the transfers to Swizz Beatz PI had a note contained in the bank statement, labelling it as an "investment in music production (Everyday is your Birthday)."   AC ¶ 115.   Defendants argue that, consequently, plaintiffs have failed to plead there was no consideration, as the transfer was an "investment."   Mot. at 4.   The Court is not convinced. First, the other alleged fraudulent conveyances had no such label.   Second, an eight-word note in a bank statement does not demonstrate that the transfer was, in fact, for that purpose.   Third, plaintiffs also plead that "The Alsen Chance Account has not received any . . . payments from Swizz Beatz PI" since the purported "investment" was made over a decade ago.   AC ¶ 115.   Because we must "draw[] all reasonable inferences in [plaintiffs'] favor," we cannot conclude plaintiffs have failed to plead lack of consideration.   Acticon AG, 692 F.3d at 37.

across many jurisdictions.  See Dornberger v. Metro. Life Ins. Co., 961 F. Supp. 506, 529 (S.D.N.Y. 1997) ("[I]t is sufficient that Plaintiff has pled the existence of a large fraudulent scheme— a scheme so large that the inference unavoidably arises that the individual [transferors] . . . were aware of or participated in it.").  The fact that Low and Tan fled Malaysia shortly after the transactions is also independently probative.  See State Farm Mut. Auto. Ins. Co. v. Fayda, No. 14 Civ. 9792 (WHP) (JCF), 2015 WL 7871037, at *4 (S.D.N.Y. Dec. 3, 2015), aff'd, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016) ("Consciousness of guilt . . . [can] be used to establish . . . intent to defraud.").

Plaintiffs list a series of "particulars" for each transaction, including the date, time, dollar amount, sender, and recipient, as well as which of the Insiders ordered the transfers. AC ¶¶ 68-123; see United Feature Syndicate, Inc., 216 F. Supp. 2d at 221-22 ("[T]he complaint must specify the 'particulars' of the alleged fraud—including, for example, the time, place, particular individuals involved, and specific conduct at issue" to satisfy the Rule 9(b) standard.); Amusement Indus., Inc., 820 F. Supp. 2d at 532 (finding allegations of actual fraudulent conveyance sufficient where "the complaint is clear as to the actual transfers it is attacking, going so far as to give names of parties to the transfers, the amounts of the transfers, the dates of the transfers, and even account numbers").  These pleadings are more

than sufficient to meet the "particularity" requirement of Rule 9(b).

Further, while defendants offer a laundry list of reasons why plaintiffs' pleadings are insufficient, Mot. at 17-20, none are convincing.  First, while it may be true that "the proper focus of a fraudulent transfer inquiry is on the transfer itself, not the overall business practices of the Debtor," id. at 17 (quoting In re Carrozzella & Richardson, 286 B.R. 480, 490 (D.Conn. 2002)), plaintiffs do not rely on "overall" practices.  They trace funds from various component schemes of the 1MDB Fraud, such as the Project Magnolia and Project Maximus bond issuances, directly to the defendants, with charts showing the dates, amounts, senders, and recipients of funds.  AC ¶¶ 71-112.  Second, defendants' contention that plaintiffs rely on "information and belief" is simply untrue.  Mot. at 18.  The phrase is used only 11 times in the 165-paragraph complaint and is almost entirely absent from the paragraphs discussing the transactions or the intent of the Insiders.  Id. ¶¶ 29-35, 65, 86, 124, 128.  Third, the "timing of the transfers" does not "undermine[] the Liquidators' theory" that they were intended to hinder creditors.  Mot. at 18-19.  The fact that the time between certain transfers was "weeks" or "months" instead of "days" does not belie fraudulent intent, id., and such fact-specific arguments are inappropriate for resolution at the pleading stage.

Defendants' further arguments that there is insufficient "linkage" between the transactions, Mot. at 19, and that plaintiffs have failed to allege a "close relationship" between Low and Dean, id. at 20, fare no better. The fact that "the Liquidators attempt to trace a linkage between widely different amounts with relatively small payments ultimately being received by the Defendants" does not hurt their claim. Id. at 19. Plaintiffs' theory is that billions were stolen for personal use by Low and other Insiders and that $7.3 million made its way to Dean, one of Low's many friends and acquaintances. AC ¶¶ 2-6. In this regard, there is no doubt that plaintiffs have pleaded with "specificity" the path that the funds took. Id. ¶¶ 71-112. Later in this litigation, defendants may challenge the accuracy of these pleadings, or proffer evidence that the funds had an alternate source. See Acticon AG, 692 F.3d at 37 (At the motion to dismiss stage, the district court must "accept[] as true all factual allegations in the complaint and draw[] all reasonable inferences in [plaintiff's] favor[.]"). Finally, defendants are incorrect that plaintiffs have failed to plead a "close relationship" between Low and Dean. Mot. at 20. Low invited Dean to his 31st birthday party, AC ¶ 40, and gifted Dean a million-dollar Warhol print, id. ¶ 41, facts which hardly suggest a casual acquaintance.

In sum, plaintiffs have pleaded specific facts supporting an inference of actual fraudulent intent, and therefore, defendants' motion to dismiss the actual fraudulent conveyance claim is denied.

### b. Constructive Fraudulent Conveyance

Next, defendants assert that plaintiffs have failed to sufficiently plead constructive fraudulent conveyance. Mot. at 20-24; Reply at 11. A constructive fraudulent conveyance is any transfer made by a "person who is or will be thereby rendered insolvent," DCL § 273, a person "about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital," id. § 274, or a person who "intends or believes that he will incur debts beyond his ability to pay as they mature," id. § 275. "[D]espite the statutory label of 'fraudulent conveyance,' [constructive fraudulent conveyance] does not require an intent to deceive or any of the traditional elements of fraud." Spanierman Gallery, PSP v. Love, 320 F. Supp. 2d 108, 113 (S.D.N.Y. 2004) (citation and internal quotation marks omitted). Therefore, "constructive fraudulent transfers are subject to the more lenient pleading standard of [Fed. R. Civ. P.] 8(a)(2) and need only give the defendant sufficient notice to prepare an answer, frame discovery and defend against the charges." In re Tronox Inc., 429 B.R. at 95-96 (citation and internal quotation marks omitted).

Plaintiffs have easily met this standard.  They have pleaded that Affinity and Alsen Chance were insolvent or became insolvent as a result of the transfers, AC ¶¶ 64, 129, 148(e), 152, 157, that they were unreasonably capitalized, id. ¶¶ 158, and that the transferors, i.e., the Insiders, knew the companies would incur debts beyond their ability to pay, id. ¶¶ 126, 159.

Defendants argue that plaintiffs have failed to produce sufficient evidence that the Insolvent Entities were insolvent at the time of the transfers.  Mot. at 22-24.  Defendants point to the fact that the Debtors had funds in their accounts at the time of the transfers that were greater than the funds transferred to Dean and his companies.  Id. at 22-24, Tables 1 and 2.  This argument is unpersuasive.  First, the cash balance in, for example, the Affinity Account at a given time would not show what liabilities Affinity might have owed.  Second, as plaintiffs point out, Opp. at 23 (collecting cases), "a presumption of insolvency arises once a lack of fair consideration is shown for a fraudulent conveyance claim under New York law," In re Firestar Diamond, Inc., 654 B.R. 836, 896 (Bankr. S.D.N.Y. 2023).  Here, defendants have alleged the transfers were for no consideration, AC ¶¶ 113-23, and thus "the [Liquidators] [are] entitled to a presumption of insolvency for [their] claim made pursuant to []DCL § 273," In re Firestar Diamond, Inc., 654 B.R. at 896-97.  Defendants do not, and at this early stage likely cannot, rebut this presumption.

Cf. Gronich & Co., Inc. v. Simon Prop. Grp., Inc., 180 A.D.3d 541, 542-43 (2020) ("[R]espondents rebutted the presumption [of insolvency] by showing that all debts of the debtor existing at the time of the [alleged fraudulent conveyance] were satisfied."). For these reasons, defendants' motion to dismiss plaintiffs' constructive fraudulent conveyance claim is denied.

### c. Unjust Enrichment

Finally, defendants argue that plaintiffs' claim of unjust enrichment is "duplicative" of the fraudulent transfer claims. Mot. at 24-25. Under New York law, a plaintiff states a claim for unjust enrichment by pleading "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that 'equity and good conscience' require restitution." Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir.2000) (citation omitted); see also Granite Partners, L.P. v. Bear, Stearns & Co., 17 F. Supp. 2d 275, 313 (S.D.N.Y. 1998) ("A defendant is enriched at the expense of a plaintiff when the defendant receives a benefit of money or property belonging to the plaintiff.") (citation omitted).

Here, plaintiffs have pleaded that the Insiders caused Affinity and Alsen Chance to transfer funds to defendants for no consideration. AC ¶¶ 114-23, 144-47, 162. Plaintiffs similarly plead that Aabar-BVI and Blackstone were harmed when, as creditors of the Debtors, the funds were transferred to defendants. Id. ¶¶ 82-89, 94-99, 164. Finally, plaintiffs plead that equity and good

conscience require the return of the fraudulently conveyed funds. Id. ¶¶ 2, 6, 165. This is sufficient to sustain a claim for unjust enrichment at the pleading stage.

Defendants argue that the unjust enrichment claim is "duplicative" because it relies on the same or similar facts as the fraudulent conveyance causes of action. Mot. at 24-25; Reply at 2. "Courts have refused to dismiss unjust enrichment claims on the basis that they were duplicative of fraudulent transfer claims, noting that it is conceivable that the plaintiff could recover under one theory but not the other." In re Platinum-Beechwood Litig., 427 F. Supp. 3d 395, 451 (S.D.N.Y. 2019) (Rakoff, J.) (citation and internal quotation marks omitted). In the fraudulent transfer context, "[w]hile there can be no doubt that the [plaintiff] would not be entitled to duplicative relief, there similarly is no doubt that at the pleadings stage, a plaintiff is not required to elect a single theory upon which to proceed." Silverman v. H.I.L. Assocs. Ltd., 387 B.R. 365, 412 (Bankr. E.D.N.Y. 2008) (noting that Fed. R. Civ. P. 8(a) "provides that '[r]elief in the alternative or of several different types may be demanded'"). Consequently, defendants' motion to dismiss plaintiffs' unjust enrichment claim is denied.

## Conclusion[14]

For the preceding reasons, defendants' motion to dismiss is denied in its entirety.  The parties should confer and submit a discovery schedule consistent with the Court's Individual Practices by October 21, 2025.  The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 25.


**SO ORDERED.**

Dated:     New York, New York
           September 26, 2025

_____
          NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[14]     The Court is aware that the parties requested oral argument.  See Mot.; Opp.; Reply.  However, given that our decision is based on clear legal doctrine, the Court determined that oral argument would not be productive.

47