**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Angela Barkhouse and Toni Shukla, as Liquidators of Affinity Equity International Partners Limited, Alsen Chance Holdings Limited, Aabar Investments PJS Limited, and Blackstone Asia Real Estate Partners Limited (In Liquidation),** | |
| *Plaintiffs,* | Case No: 24 Civ. 7491 |
| — against — | JURY TRIAL DEMANDED |
| **Kasseem Dean, Monza Studios, Inc., and Swizz Beatz Productions Inc.,** | |
| *Defendants.* | |

**SECOND AMENDED COMPLAINT**

1.      Plaintiffs Angela Barkhouse and Toni Shukla (the "**Liquidators**" or "**Plaintiffs**"), as the joint liquidators of Affinity Equity International Partners Limited ("**Affinity**"), Alsen Chance Holdings Limited ("**Alsen Chance**") (together with Affinity, the "**Debtors**"), Aabar Investments PJS Limited ("**Aabar-BVI**"), and Blackstone Asia Real Estate Partners Limited ("**Blackstone**") (together with Aabar-BVI, the "**Creditors**"), bring this lawsuit against Defendants Kasseem Dean ("**Dean**"), Monza Studios, Inc. ("**Monza Studios**"), and Swizz Beatz Productions Inc. ("**SB Productions**") (collectively with Dean and Monza Studios, the "**Defendants**").

**INTRODUCTION**

2.      This case concerns the recovery of $7,300,000 that the notorious international fugitive Jho Low ("**Low**") and his associates (collectively, the "**Insiders**") stole from the people of Malaysia and gifted to the Defendants—Dean, a well-known celebrity who goes by the stage name of "Swizz Beatz," and his companies. The Insiders facilitated these fraudulent transfers through the bank accounts of the Debtors, whom the Insiders created as shell companies with no

legitimate business purpose. By using the Debtors, the Creditors, and other shell companies to facilitate similar transactions, the Insiders diverted and siphoned off over $7.65 billion from 1 Malaysia Development Berhad ("**1MDB**")—initially established as a sovereign wealth fund and then converted into a federal entity on September 25, 2009, owned by the Malaysian Ministry of Finance Incorporated—and its sister company SRC International Sdn Bhd ("**SRC International**") to themselves and willing recipients like the Defendants (the "**1MDB Fraud**").

3.　　The Insiders dominated and controlled the Debtors and Creditors until at least 2018, when Malaysia ousted and indicted then-Prime Minister and former 1MDB chairman Mohb Najib bin Hj Abdul Razak Najib ("**Najib**") for his involvement in the 1MDB Fraud. Najib was Chairman of 1MDB from 2009 to 2016, and emeritus advisor from 2012 to 2019. Najib also served as Malaysia's Finance Minister and so indirectly controlled 1MDB. During his tenure in these positions, Najib thwarted attempts by the Malaysian Government to investigate the 1MDB Fraud and effectively concealed the Debtors' and Creditors' involvement. As international investigations into the 1MDB Fraud unfolded, and numerous shell companies that the Insiders used to facilitate the 1MDB Fraud uncovered, the Debtors and Creditors were placed into liquidation proceedings in the British Virgin Islands ("**BVI**"). The Plaintiffs are the properly appointed liquidators of the Debtors and Creditors, appointed by the Eastern Caribbean Supreme Court, British Virgin Islands, High Court of Justice Commercial Division (the "**BVI Court**").

4.　　As duly appointed liquidators of the Debtors and Creditors, BVI law charges Plaintiffs with fiduciary duties to investigate potential claims and causes of action, commence suit to recover on such claims and causes of action on behalf of Debtors' creditors, and distribute the assets of the Debtors to those creditors pursuant to judicial oversight and in accordance with BVI law. Following their appointment, the Plaintiffs commenced an investigation into the facts and circumstances of the Debtors' involvement in the 1MDB Fraud, and the ultimate winding up of the Debtors. This investigation culminated in the Plaintiffs' determination, in their exercise of their fiduciary and statutory duties under BVI law, to bring this action against Defendants for their

unjust enrichment in retaining the proceeds of the fraudulent transfers out of the Debtors' accounts (the "**Fraudulent Transfers**"), each of which is reflected in Table 1 below:

*Table 1*

| Date | Originator | To | Amount |
|---|---|---|---|
| 09/21/2012 | Alsen Chance | SB Productions | $1,500,000.00 |
| 10/01/2012 | Alsen Chance | SB Productions | $1,000,000.00 |
| 10/22/2012 | Alsen Chance | SB Productions | $800,000.00 |
| 11/11/2013 | Affinity | Monza Studios | $800,000.00 |
| 12/26/2013 | Affinity | Monza Studios | $1,000,000.00 |
| 06/19/2014 | Affinity | Dean | $500,000.00 |
| 07/25/2014 | Affinity | Dean | $300,000.00 |
| 09/04/2014 | Affinity | Dean | $1,400,000.00 |
| **Total Amount** | | | **$7,300,000.00** |

## PARTIES AND OTHER RELEVANT ENTITIES

### I.    Plaintiffs

5.    The BVI Court appointed Angela Barkhouse and Toni Shukla as liquidators of the Debtors, Creditors, and other similarly situated companies involved in the 1MDB Fraud pursuant to BVI insolvency proceedings brought by 1MDB, SRC International, and other creditors to the 1MDB Fraud (the "**BVI Proceedings**").

6.    The BVI Proceedings are part of 1MDB and SRC International's global efforts to recover assets for the benefit of the ultimate creditors to the 1MDB Fraud—the people of Malaysia.

7.    The BVI Proceedings are subject to the BVI Insolvency Act 2003 (the "**Insolvency Act**"), which establishes a framework for controlled, court-supervised and collective reorganization and restructuring of obligations of distressed companies. The purpose of a liquidation under the Insolvency Act is to realize the assets of the company, declare a dividend for creditors, and return the surplus to the members of the debtor.

3

8.      Upon the commencement of the liquidation of a company under the Insolvency Act, no person other than the appointed liquidator for that company may commence or proceed with any action in relation to the company's assets. Such assets include the company's claims for any fraudulently transferred funds.

9.      Upon their appointment, the Liquidators have managed the affairs, business, and property of the Debtors and Creditors in order to facilitate the recovery of assets on behalf of each of their creditors.

10.     Upon resolution of these proceedings, the Insolvency Act charges the Liquidators with distributing any recovered funds to the Debtors' creditors pursuant to judicial oversight and in accordance with BVI law.

11.     While Angela Barkhouse has been a joint liquidator of the Debtors and Creditors at all relevant times, the BVI Court appointed Toni Shukla to replace Helen Janes as Joint Liquidator of Affinity and the Creditors on November 16, 2023. Another individual, Carl Jackson, served as joint liquidator of Affinity and the Creditors until his removal as such on July 26, 2024.

## II.    Debtors

### A.    Affinity

12.     Affinity, a BVI company, was incorporated under the BVI Companies Act 2004 on July 3, 2012.

13.     On October 25, 2021, the BVI Court ordered that Affinity be restored to the BVI Register of Companies, and appointed Angela Barkhouse, Carl Jackson, and Helen Janes as joint liquidators of Affinity.

14.     On August 31, 2022, the Joint Liquidators for Affinity filed a petition for Chapter 15 recognition in the Southern District of Florida.

15.     On October 4, 2022, the Southern District of Florida granted Affinity's petition for Chapter 15 recognition.

4

B.  Alsen Chance

16.    Alsen Chance, a BVI company, was incorporated under the BVI Companies Act 2004 on May 18, 2009.

17.    On September 6, 2023, the BVI Court ordered that Alsen Chance be restored to the BVI Register of Companies, and appointed Angela Barkhouse and Toni Shukla as Joint Liquidators of Affinity.

18.    On February 15, 2024, the Joint Liquidators for Alsen Chance filed a petition for Chapter 15 recognition in the Southern District of Florida.

19.    On March 28, 2024, the Southern District of Florida granted Alsen Chance's petition for Chapter 15 recognition.

## III.    Creditors

A.    Aabar-BVI

20.    Aabar-BVI, a BVI company, was incorporated under the BVI Companies Act 2004 on March 14, 2012.

21.    On May 16, 2022, the BVI Court ordered that Aabar-BVI be restored to the BVI Register of Companies, and appointed Angela Barkhouse, Carl Jackson, and Helen Janes as joint liquidators of Aabar-BVI.

22.    On August 31, 2022, the Joint Liquidators for Aabar-BVI filed a petition for Chapter 15 recognition in the Southern District of Florida.

23.    On October 5, 2022, the Southern District of Florida granted Aabar-BVI's petition for Chapter 15 recognition.

B.  Blackstone

24.    Blackstone, a BVI company, was incorporated under the BVI Companies Act 2004 on November 1, 2010.

25.    On May 15, 2022, the BVI Court appointed Angela Barkhouse, Carl Jackson and Helen Janes as joint liquidators of Blackstone.

5

26.     On August 31, 2022, the Joint Liquidators for Blackstone filed a petition for Chapter 15 recognition in the Southern District of Florida.

27.     On October 5, 2022, the Southern District of Florida granted Blackstone's petition for Chapter 15 recognition.

## IV.    Defendants

28.     Dean is a notable record producer, rapper, disc jockey and record executive known professionally as "Swizz Beatz."

29.     Upon information and belief, Dean is a California resident.

30.     Upon information and belief, Dean maintained residence in New York until March 2013, and residence in New Jersey from March 2013 through 2022.

31.     Upon information and belief, Dean held a bank account with JP Morgan Chase N.A. in New York, New York at the time of the Fraudulent Transfers.

32.     Upon information and belief, Dean operates and conducts his business through SB Productions and Monza Studios, both companies of which he is the sole owner and operator.

33.     Upon information and belief, Monza Studios is incorporated in New York and maintains its principal place of business in New York.

34.     Upon information and belief, SB Productions is a national music production company incorporated in Nevada that is engaged in the business of producing and distributing music.

35.     Upon information and belief, SB Productions conducts significant business in New York and held a bank account with JP Morgan Chase Bank in New York, New York at the time of the Fraudulent Transfers.

## V.    The Insiders

### A.    Jho Low

36.     Low Taek Jho, aka "Jho Low," was a Malaysian national who advised on the creation of Terengganu Investment Authority, the predecessor entity to 1MDB.

6

37.     Though he did not hold a formal position at 1MDB, nor was he employed by the Governments of Malaysia, Low worked as an intermediary for 1MDB and other Malaysian government officials on numerous financial transactions and projects.

38.     As the 1MDB Fraud was underway, Low became a well-known figure in the Hollywood scene and developed a reputation as a businessman with deep pockets and a penchant for hosting lavish, star-studded parties and group vacations. Throughout the early 2010s, Low befriended many U.S. celebrities including Dean and his wife, Alicia Keys.

39.     Dean and Low's friendship has now been widely reported as investigators have slowly uncovered the extent of the 1MDB Fraud.

40.     In November 2012, Dean attended Low's 31st birthday party in Las Vegas, which the Wall Street Journal has since dubbed the "Wildest Party Vegas Ever Saw."

41.     According to a complaint filed by the Department of Justice, Low gifted Dean an Andy Warhol portrait entitled "Round Jackie" (the "**Warhol**") in 2014 that he purchased from Sotheby's just one year prior for $1,055,000. Dean publicly acknowledged his possession of the Warhol in September 2020 when he agreed to forfeit the same to the United States. Later that month, the Central District of California entered a Consent Judgment of Forfeiture granting the Warhol to the United States and finding reasonable cause for its seizure.

42.     Low controlled the Debtors' bank accounts by way of his proxy, Eric Tan.

43.     Low used misappropriated funds traceable to 1MDB and SRC International, through the Debtors and Creditors, to pay the Defendants and others without receiving any consideration for the Debtors, the Creditors, or 1MDB and SRC International.

44.     Since around May 2015, Jho Low has been an international fugitive. His current whereabouts are unknown.

B. Eric Tan

45.     Eric Tan Kim Loong ("**Eric Tan**") was a Malaysian national and Low's associate.

46.    Eric Tan served as a proxy for Low in various transactions and was the named beneficial owner of several bank accounts into which funds traceable to 1MDB were diverted, including those of the Debtors and Blackstone.

47.    Since around May 2015, Eric Tan has been an international fugitive. His current whereabouts are unknown.

C.  Najib

48.    Najib was the Prime Minister of Malaysia from 2009 to 2018, the Malaysian Minster of Finance from 2008 to 2018, and the chairman of the 1MDB Board of Advisors from 2009 to 2016.

49.    Najib was the main force behind 1MDB's establishment and the main force in preventing the 1MDB Fraud from being investigated and discovered.

50.    In 2020, the Kuala Lumpur High Court sentenced Najib to twelve years in prison for corruption, money laundering, and abuse of power. A Malaysian federal court dismissed Najib's appeal of the conviction and sentence on August 23, 2022, commencing his prison sentence. On January 20, 2024, Malaysia's Pardons Board controversially halved Najib's sentence. Najib presently remains in custody.

D.  Al-Husseiny and Al Qubaisi

51.    Mohamed Ahmed Badawy Al-Husseiny ("**Al-Husseiny**") is a U.S. citizen and was formerly the CEO of Aabar Investments PJS ("**Aabar UAE**"), a subsidiary of the International Petroleum Investment Company ("**IPIC**"). Incorporated in the United Arab Emirates ("**UAE**"), IPIC was an investment fund wholly owned by the government of Abu Dhabi UAE.

52.    Khadem Abdulla Al Qubaisi ("**Al Qubaisi**"), a UAE national, was the Managing Director of IPIC from 2007 to 2015.

53.    Al Husseiny and Al Qubaisi were associates of Low's and the directors and beneficial owners of several shell companies involved in the 1MDB Fraud, including Aabar-BVI and a Seychelles company of the same name ("**Aabar-Seychelles**"). IPIC has previously disclosed

that additional entities **"incorporated in other offshore jurisdictions using variations of the 'Aabar name'"** were "outside the group's corporate structure."

54.     In June 2019, a criminal court in Abu Dhabi, UAE sentenced Al-Husseiny to ten years in prison and Al Qubaisi to fifteen years in prison for their roles in the 1MDB Fraud.

## JURISDICTION AND VENUE

55.     Subject matter jurisdiction exists under 28 U.S.C. § 1334(b), as this proceeding relates to the Chapter 15 proceedings of the Debtors and Creditors[1] pending in the Bankruptcy Court of the Southern District of Florida.

56.     Subject matter jurisdiction is further proper by virtue of diversity of citizenship, 28 U.S.C. § 1332. The matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs, and there is complete diversity of citizenship.

57.     This Court has personal jurisdiction over Dean under New York Civil Practice Law and Rules ("**CPLR**") Section 302(A) because he transacts business within New York and committed a tortious act within the state. This Court also has personal jurisdiction over Dean because he has sufficient minimum contacts with New York to satisfy due process.

58.     This Court has personal jurisdiction over Monza Studios because Monza Studios was incorporated in New York and maintains a principal place of business in New York.

59.     This Court has personal jurisdiction over SB Productions under CPLR § 301 because SB Productions engages in a continuous and systematic course of business in New York. As a result of his doing business in New York through SB Productions and Monza Studios, Dean is also subject to personal jurisdiction under CPLR § 301.

---

[1] *In re: Affinity Equity Int'l Partners Ltd.*, Case No. 22-16815 (Bankr. S.D. Fla.); *In re: Alsen Chance Holdings Ltd.*, No. 24-11465 (Bankr. S.D. Fla.); *In re: Aabar Investments PJS*, Case No. 22-16802 (Bankr. S.D. Fla.); *In re: Blackstone Asia Real Estate Partners Limited*, Case No. 22-16805 (Bankr. S.D. Fla.).

60.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the conduct and events giving rise to the Liquidators' claims took place in the Southern District of New York.

### NOTICE PURSUANT TO FED. R. CIV. P. 44.1

61.     Issues to be resolved in this case may be determined to be governed by the laws of the British Virgin Islands. In that event, Plaintiffs intend to rely upon the applicable laws of that territory.

### FACTUAL SUMMARY

62.     Najib, with the help of Low, created 1MDB for the purported purpose of pursuing investment and development projects for the economic benefit of Malaysia and its people.

63.     By establishing shell companies in multiple jurisdictions around the world through which they diverted misappropriated funds from 1MDB and SRC International, the Insiders conspired to launder the proceeds of this criminal conduct for their personal benefit, including *inter alia* the purchases of luxury residential real estate in the United States, artwork from New York City auction houses, and the funding of major Hollywood films.

64.     Among these shell companies, the Debtors and Creditors had no assets that generated revenue, board of directors, office space, address, or telephone number. They did not issue stock, kept no corporate records, and incurred debts while retaining no equity.

65.     Upon information and belief, the Debtors and Creditors' Insider-managers only transacted funds through the Debtors and Creditors' bank accounts for their personal use and used the Debtors and Creditors as pass-through entities to obfuscate the movement of funds misappropriated from 1MDB and SRC International.

66.     The Insiders funneled over $1.5 billion in misappropriated 1MDB and SRC International funds into the Debtors' bank accounts. Specifically, between July 18, 2013 and September 10, 2014, Affinity received approximately $775 million in misappropriated 1MDB/SRC International funds. Between May 2010 and February 2013, Alsen Chance received $806 million in misappropriated 1MDB/SRC International funds.

67.     The Insiders used these misappropriated funds *inter alia* to make the Fraudulent Transfers through the Debtors' bank accounts.

## I.     The Debtors Receive 1MDB and SRC International's Misappropriated Funds

68.     Bank records of the Debtors, the Creditors, and the Insiders' other shell companies reveal that the Debtors received their funds from 1MDB and SRC International through at least three different fraudulent schemes involving the Creditors.

69.     In total, the Insiders transferred at least $199,500,000 from Aabar-BVI's bank accounts to Affinity's bank accounts and $53,625,000 from Blackstone's bank accounts to Alsen Chance's bank account.

70.     The Liquidators' investigation suggests that the Debtors did not give the Creditors consideration for those transfers. The Creditors therefore have a right to payment from the Debtors.

### E.     The Aabar-BVI Phase

71.     The "Aabar-BVI" phase of the 1MDB Fraud involved the misappropriation of bond issue proceeds. Goldman Sachs ("**Goldman**") arranged and underwrote these bonds for the purported purposes of financing 1MDB's acquisition of energy and natural resources assets. The first tranche of bonds, which Goldman internally called "Project Magnolia," comprised of $1.75 billion issued by 1MDB subsidiary 1MDB Energy Limited ("**1MDB Energy**" or "**1MEL**") in May 2012. The second tranche, called Project Maximus, comprised of $1.75 billion issued by 1MDB Energy (Langat) Limited ("**1MELL**") in October 2012.

#### i.     The Project Magnolia Bond Issue

72.     In or around January 2012, officials at 1MDB approached Goldman for financial advice in connection with 1MDB's anticipated acquisition of certain energy and natural resource assets in Malaysia.

73.     On or about March 2, 2012, 1MDB Energy agreed to acquire Tanjong Energy Holdings Sdn Bhd ("**Tanjong Energy**"), a power production company, from Tanjong Power Holdings Sdn Bhd ("**Tanjong Power**") for approximately $2.755 billion. 1MDB planned to raise

11

most of the funds for the purchase through the local bank market. 1MDB engaged Goldman to assist in securing financing for the remaining amount necessary to complete the deal.

74.     The offering circular for the Project Magnolia bonds indicates that 1MDB Energy issued $1.75 billion in privately-placed notes, with net proceeds projected to be approximately $1,553,800,000, once Goldman's fees, commissions, and expenses were deducted.

75.     The offering circular also represented that the net proceeds of the bond issue were to be used to "partially fund" the acquisition of Tanjong Energy. Of the approximately $1,553,800,000 raised through the Project Magnolia bond sale, approximately $810,000,000 was designated in the offering circular for use in acquiring Tanjong Energy. The remainder of the net proceeds, approximately $744,000,000, was designated for "general corporate purposes (which may include future acquisitions)."

76.     Nearly $577,000,000—a sum equivalent to more than one third of the net proceeds of the Project Magnolia bond offering—was diverted to Aabar-BVI within one day of 1MDB's having received the proceeds of the bond offering, however. Nothing in the offering circular disclosed that 1MDB would transfer any of the bond proceeds to Aabar-BVI.

*ii.     The Project Maximus Bond Issue*

77.     In or around June 2012, 1MDB sought Goldman's assistance in raising an additional tranche of capital to acquire power assets from a Malaysian entity named Genting Berhad ("**Genting**"). Within Goldman, this private placement bond transaction was referred to by the name "Project Maximus."

78.     On or about August 13, 2012, 1MDB entered into an agreement to purchase power assets from Genting. That same day, 1MDB created another wholly-owned subsidiary called 1MDB Energy (Langat) Limited ("**1MDB Energy Langat**"), for the purposes of holding the power assets and issuing debt securities to fund the acquisition Genting power assets.

79.     The offering circular for Project Maximus, dated October 17, 2012, indicated that 1MDB issued $1.75 billion in bonds, netting to approximately $1,636,260,000 once Goldman's fees, commissions, and expenses were deducted.

12

80.     The offering circular also represented that 1MDB Energy Langat would use approximately $692,357,349 of the net proceeds for the purpose of the Genting acquisition, and the balance of the proceeds "for general corporate purposes (which may include future acquisitions)."

81.     1MDB Energy Langat, however, diverted $790,354,855 of the net proceeds of the Project Maximus bond offering to Aabar-BVI on or about the same day that 1MDB received the proceeds of this bond sale. As with Project Magnolia, the offering circular for Project Maximus did not disclose that nearly half of the net bond proceeds would be transferred to Aabar-BVI, in the form of "collateral" or otherwise, or that funds transferred to Aabar-BVI would subsequently be used for the personal benefit of the Insiders.

82.     Between May 25, 2012 and July 25, 2012, Aabar-BVI transferred $428,000,000 of the funds from 1MDB Energy to a Singapore bank account held by Blackstone.

83.     Between May 29, 2012 and September 20, 2012, Blackstone transferred a total of $53,625,000 in thirteen transactions to an account at Standard Chartered Bank in Singapore held in the name of Alsen Chance ("**Alsen Chance Account**").

84.     On September 21, 2012, Jho Low and/or Eric Tan caused the Alsen Chance Account to transfer $1,500,000 to an account at JP Morgan Chase Bank in New York, New York held in the name of SB Productions ("**SB Productions Account**").

85.     These pass-through transactions are depicted in Table 2 below:

*Table 2*

| Date | Sending Party | Receiving Party | Amount |
|---|---|---|---|
| 05/22/2012 | 1MDB Energy | Aabar-BVI | $576,943,490 |
| 05/25/2012 | Aabar-BVI | Blackstone | $295,000,000 |
| 05/29/2012 – 08/01/2012 | Blackstone | Alsen Chance | $ 32,375,000 |
| 07/25/2012 | Aabar-BVI | Blackstone | $133,000,000 |
| 08/06/2012 - 09/20/2012 | Blackstone | Alsen Chance | $21,250,000 |
| 09/21/2012 | Alsen Chance | SB Productions | $1,500,000 |

86.     On October 1, 2012 and October 22, 2012, Jho Low and/or Eric Tan caused the Alsen Chance Account to transfer $1,000,000 and $800,000 to the SB Productions Account,

respectively. Upon information and belief, the funds used for these transfers were misappropriated from 1MDB or SRC International.

87.    On September 10, 2013, Al-Husseiny and/or Al Qubaisi caused the Aabar-BVI to send $25,500,000 to an account at DBS Bank Limited in Singapore in the name of Affinity ("**Affinity Account**").

88.    On November 11, 2013, Jho Low and/or Eric Tan caused the Affinity Account to transfer $800,000 of these funds to a bank account in the name of Monza Studios (the "**Monza Studios Account**").

89.    These pass-through transactions are depicted in Table 3 below:

*Table 3*

| Date | Sending Party | Receiving Party | Amount |
|---|---|---|---|
| 10/19/2012 | 1MDB | 1MDB Energy Langat | $1,640,000,000 |
| 10/19/2012 | 1MDB Energy Langat | Aabar-BVI | $790,354,855 |
| 09/10/2013 | Aabar-BVI | Affinity | $25,500,000 |
| 11/11/2013 | Affinity | Monza Studios | $800,000 |

F.    The Options Buyback Phase

90.    The "Options Buyback" phase of the 1MDB Fraud involved the misappropriation of loan proceeds issued under the false pretenses that the proceeds would be used to acquire options granted to Aabar UAE, for guaranteeing the Project Magnolia and Project Maximus bonds.

91.    On May 26, 2014, Deutsche Bank agreed to a bridge loan facility of $250,000,000 to 1MDB's subsidiary, 1MDB Energy Holdings Limited ("**1MEHL**") ("**Deutsche Bank Bridge Loan**") for this purpose.

92.    On May 28, 2014, $239,940,000 in proceeds from the Deutsche Bank Bridge Loan were transferred into a bank account held in the name of 1MEHL at Falcon Bank ("**1MEHL Account**").

93.    On or about May 28, 2014, the 1MEHL Account transferred $175,000,000 in loan proceeds to Aabar-BVI.

14

94. Between May 30, 2014, and June 18, 2014, Al-Husseiny and/or Al Qubaisi caused the Aabar-BVI account to transfer a total of $174,000,000 of these funds to the Affinity Account.

95. On June 19, 2014, the Affinity Account transferred $500,000 of these funds to an account at JP Morgan Chase Bank in New York held in the name of Kasseem Dean (the "**Dean Account**").

96. On June 18, 2014, Affinity also transferred $7,500,000 of the loan proceeds to a Seychelles company named Alpha Synergy Limited ("**Alpha Synergy**"). Low was the sole beneficial owner of Alpha Synergy.

97. On July 25, 2014, Alpha Synergy transferred $2,950,000 of these funds to the Affinity Account.

98. On July 25, 2014, Jho Low and/or Eric Tan caused the Affinity Account to transfer $300,000 of these funds to the Dean Account.

99. These pass-through transactions are depicted in Table 4 below:

*Table 4*

| Date | Sending Party | Receiving Party | Amount |
|---|---|---|---|
| 05/26/2014 | Deutsche Bank | 1MEHL | $250,000,000 |
| 05/28/2014 | 1MEHL | Aabar-BVI | $175,000,000 |
| 05/30/2014 | Aabar-BVI | Affinity | $155,000,000 |
| 06/18/2014 | Aabar-BVI | Affinity | $19,000,000 |
| 06/18/2014 | Affinity | Alpha Synergy | $7,500,000 |
| 06/19/2014 | Affinity | Dean | $500,000 |
| 07/25/2014 | Alpha Synergy | Affinity | $2,950,000 |
| 07/25/2014 | Affinity | Dean | $300,000 |

100. Deutsche Bank arranged a second syndicated loan for 1MDB in September 2014 for $975,000,000. The purpose of this loan was to refinance the Deutsche Bank Bridge Loan and further acquire the Aabar UAE/IPIC options.

101. On September 2, 2014, Deutsche Bank transferred $223,333,000 to the account of Aabar Seychelles at 1MDB's request.

15

102.    On September 30, 2014, Deutsche Bank transferred $457,984,607 to the Aabar Seychelles Account.

103.    On September 4, 2014, the Aabar Seychelles Account transferred $103,333,000 of these funds to the Affinity Account.

104.    On September 4, 2014, Jho Low and/or Eric Tan caused the Affinity Account to transfer $1,400,000 of these funds to the Dean Account.

105.    These pass-through transactions are depicted in Table 5 below:

*Table 5*

| Date | Sending Party | Receiving Party | Amount |
|---|---|---|---|
| 09/02/2014 | Deutsche Bank | Aabar Seychelles | $223,300,000 |
| 09/30/2014 | Deutsche Bank | Aabar Seychelles | $457,984,607 |
| 09/04/2014 | Aabar Seychelles | Affinity | $103,333,000 |
| 09/04/2014 | Affinity | Dean | $1,400,000 |

G.    The SRC Phase

106.    The SRC Phase involved the misappropriation of loan facilities advanced by the manager for one of Malaysia's largest pension funds, the Kumpulan Wang Persaraan (Diperbadankan) ("**KWAP**"), to SRC International in 2011 and 2012. The nominal purpose of the loan facilities was to invest in projects associated with the exploration, extraction, processing and trading of energy resources, natural resources, and minerals.

107.    SRC International transferred $1.1 billion of the KWAP loan facilities to a BVI-incorporated subsidiary of SRC International, SRC International (Malaysia) Limited ("**SRC BVI**"), almost all of which was misappropriated by those involved in the 1MDB Fraud.

108.    As part of this transfer, SRC International advanced $864,486,500 of the KWAP loans to a bank account at BSI Bank in Switzerland held by SRC BVI (the "**SRC BVI Account**").

109.    On December 20, 2013, the SRC BVI Account transferred $12,193,878 to Pacific Harbor Global Growth Fund, a purported investment fund incorporated in BVI that is now known as Pacific Rim Global Growth Limited (now in liquidation) ("**Pacific Rim**").

16

110.    On December 24, 2013, Pacific Rim transferred $11,950,000 of the SRC BVI funds to the Affinity Account.

111.    On December 26, 2013, Jho Low and/or Eric Tan caused the Affinity Account to transfer $1,000,000 of these funds to the Monza Studios Account.

112.    These pass-through transactions are depicted in Table 6 below:

*Table 6*

| Date | Sending Party | Receiving Party | Amount |
|---|---|---|---|
| 11/16/2011 - 04/02/2014 | SRC International | SRC BVI | $1,119,486,500 |
| 12/20/2013 | SRC BVI | Pacific Rim | $12,193,878 |
| 12/24/2013 | Pacific Rim | Affinity | $11,950,000 |
| 12/26/2013 | Affinity | Monza Studios | $1,000,000 |

## II.    The Defendants Receive the Fraudulent Transfers Without Exchanging Fair Consideration.

113.    Between September 21, 2012 and September 4, 2014, Jho Low and/or Eric Tan caused the Debtors to make the Fraudulent Transfers to the Defendants without disclosing the transfers.

### A.    The Alsen Chance Transfers to SB Productions

114.    Between September 21, 2012 and October 22, 2012, Jho Low and/or Eric Tan caused the Alsen Chance Account to transfer $3,300,000 to the SB Productions Account (the "**Alsen Chance Transfers**").

115.    On September 21, 2012, Jho Low and/or Eric Tan caused the Alsen Chance Account to transfer $1,500,000 to the SB Productions Account. Bank statements for the Alsen Chance Account reflect a note for this $1,500,000 transfer to SB Productions stating "Alsen Chance investment in music production (Everyday is your Birthday)." The Alsen Chance Account has not received any investment payments from SB Productions (or any other Defendant), however.

116.    On October 1, 2012, Jho Low and/or Eric Tan caused the Alsen Chance Account to transfer $1,000,000 to the SB Productions Account. The Alsen Chance Account did not receive

any money back from the SB Productions Account or any other consideration from SB Productions in exchange for this transfer.

117.    On October 22, 2012, Jho Low and/or Eric Tan caused the Alsen Chance Account to transfer $800,000 to the SB Productions Account. The Alsen Chance Account did not receive any money back from the SB Productions Account or any other consideration from SB Productions in exchange for this transfer.

B.  The Affinity Transfers to Monza Studios and Dean

118.    Between November 11, 2013 and September 4, 2014, Jho Low and/or Eric Tan caused the Affinity Account to transfer $4,000,000 to Monza Studios and Dean (the "**Affinity Transfers**").

119.    On November 11, 2013, Jho Low and/or Eric Tan caused the Affinity Account to transfer $800,000 to Monza Studios. The Affinity Account did not receive any money back from Monza Studios or any other consideration from Monza Studios in exchange for this transfer.

120.    On December 26, 2013, Jho Low and/or Eric Tan caused the Affinity Account to transfer $1,000,000 to Monza Studios. The Affinity Account did not receive any money back from Monza Studios or any other consideration from Monza Studios in exchange for this transfer.

121.    On June 19, 2014, Jho Low and/or Eric Tan caused the Affinity Account to transfer $500,000 to the Dean Account. The Affinity Account did not receive any money back from the Dean Account or any other consideration from Dean in exchange for this transfer.

122.    On July 25, 2014, Jho Low and/or Eric Tan caused the Affinity Account to transfer $300,000 to the Dean Account. The Affinity Account did not receive any money back from the Dean Account or any other consideration from Dean in exchange for this transfer.

123.    On September 4, 2014, Jho Low and/or Eric Tan caused the Affinity Account to transfer $1,400,000 to the Dean Account. The Affinity Account did not receive any money back from the Dean Account or any other consideration from Dean in exchange for this transfer.

**III.    1MDB Misses Loan Payments and Low and Tan Abscond from Malaysia.**

124.    In or around January 2015, 1MDB missed a loan payment of about $550 million. Upon information and belief, the Insiders' theft of 1MDB funds through the Fraudulent Transfers and other similar transactions caused 1MDB's failure to pay the loan.

125.    In or around March 2015, Malaysia's government created a special task force to investigate 1MDB.

126.    In or around May 2015, Jho Low and Eric Tan fled Malaysia.

127.    Between 2015 and 2018, Najib and his administration thwarted Malaysian-led investigations into 1MDB including by firing the attorney general leading the investigation, reshuffling his cabinet, and removing key critics.

128.    In 2016, 1MDB failed to make another payment on a $1.75 billion bond, triggering cross defaults on some of its other bonds. Upon information and belief, the Insiders' theft of 1MDB funds through the Fraudulent Transfers and other similar transactions caused 1MDB's failure to pay the bond.

129.    In or around May 2018, Najib lost Malaysia's general election to current Prime Minister Mahathir Mohammad and was removed as Prime Minister. Under the new administration, 1MDB and SRC International's directors confirmed that both companies were insolvent and unable to repay their debts. The 1MDB Asset Recovery Taskforce was convened with the objective of securing restitution following the 1MDB Fraud, chaired by Datuk Seri Johari Abdul Ghani and comprised of representatives from Malaysia's Ministry of Finance, the Malaysian Anti-Corruption Commission, and the Malaysian Attorney General's Chambers. Malaysia's newly appointed finance minister appointed PricewaterhouseCoopers as auditors for 1MDB.

130.    Since the formation of the 1MDB Asset Recovery Taskforce in May 2018, the new Boards of 1MDB and SRC International have investigated and uncovered details about the 1MDB Fraud that were previously known only by the Insiders. The fraud involved hundreds of entities and thousands of fraudulent transactions, false paper trails and sham companies. Accordingly, it

has taken a considerable amount of time and effort to piece together the fraud and the Debtors' and Creditors' involvement.

131.    Prior to the Liquidators' appointment, the precise manner by which the Insiders effected the 1MDB Fraud and the roles of the individual entities used (including the Debtors and Creditors) remained unclear. The Liquidators' appointment has significantly expedited efforts to trace funds directly from 1MDB and SRC International through to their ultimate destination, including the Fraudulent Transfers.

## IV.    The Liquidators' Appointment & Discovery of the Transfers

132.    The Liquidators learned of the Affinity Transfers on or around February 18, 2022, when they received bank statements from DBS Bank Limited for the Affinity Account reflecting the transfers.

133.    The Liquidators learned of the Alsen Chance Transfers on or around December 12, 2022, when they received bank statements from Standard Chartered Bank, N.A. for the Alsen Chance Account reflecting the transfers.

## V.    Defendants Have Refused to Explain or Voluntarily Forfeit the Transfers

134.    Dean, unlike the other U.S. celebrities and affiliated entities who received (and forfeited) money from Low and the Insiders, has not yet returned any of the money he received from the Fraudulent Transfers nor acknowledged receiving millions of dollars from Low.

135.    Dean knew or should have known that the money he received from Low through the Debtors' accounts had ultimately been misappropriated from 1MDB or SRC International given extensive reporting on Low's involvement in the 1MDB Fraud and Department of Justice filings charging Low and pursuing the stolen funds.

136.    On February 8, 2015, just five months after the last Fraudulent Transfer to Dean's bank account, the New York Times published an exposé on Low, Najib, their relationship to 1MDB and SRC International, and Low's multi-million-dollar real estate purchases funded by unknown sources. The article detailed how Low used shell companies for his lavish expenditures in the United States, that his explanations for where he obtained his money were inconsistent and

unverifiable, and that even Malaysian party officials acknowledged that 1MDB's oversight was scant, therefore creating conditions "fertile" for fraud.

137. In July 2016, the Department of Justice filed civil forfeiture complaints seeking the forfeiture and recovery of more than $1 billion stolen from 1MDB and SRC International, naming Low, Najib, and others as participants in the fraud.

138. In November 2018, the Department of Justice unsealed a criminal indictment charging Low and others with conspiring to launder billions of dollars embezzled from 1MDB through the U.S. financial system for their personal benefit.

139. In July 2020, the Department of Justice filed a civil forfeiture complaint seeking the forfeiture and recovery of the Warhol that Low gifted Dean.

140. By letter dated September 13, 2024, the Liquidators, through their counsel, sent a letter to Defendants explaining all transfers made to the Defendants and providing them a deadline of September 20, 2024 to provide any justification for the transfers and provide any documents supporting any consideration extended for the transfers.

141. Despite the Liquidators' counsel receiving calls from two different sets of counsel who represented that they might be retained by Defendants, neither set of counsel ever called back to confirm they were retained. Moreover, none of the Defendants ever responded to the letter or provided any documentation or explanation for the Transfers. As a result, this action was filed.

## VI. Alter Ego/Veil Piercing

142. Dean exercised complete domination over both Monza Studios and Swizz Beatz, with respect to the Fraudulent Transfers.

143. Dean has been the sole owner and operator of Monza Studios and SB Productions at all relevant times.

144. Dean is the CEO of both Monza Studios and SB Productions and the president, secretary, and treasurer of Monza Studios.

145. Monza Studios and SB Productions both share the same address with Dean's financial advisor, DDK & Company LLP, and do not have their own office space.

146.   Monza Studios has only 200 shares with a value per share of $0.

147.   SB Productions has only 100 shares with a value per share of $1.

148.   Neither Monza Studios nor SB Productions maintain insurance that may provide coverage for these claims.

149.   Neither Monza Studios nor SB Productions maintain a public-facing website or brick and mortar location.

150.   Upon information and belief, Monza Studios has no employees other than Dean.

151.   Upon information and belief, neither Monza Studios nor SB Productions maintain corporate records.

152.   Monza Studios and SB Productions claim to be shell companies with no assets and have been inactive for many years.

153.   Upon information and belief, Dean has intentionally undercapitalized Monza Studios and SB Productions, rendering any judgment against those companies uncollectible.

154.   Dean used his domination of Monza Studios and SB Productions to commit a wrong that injured the Liquidators.

155.   As a result of Dean's use of his domination of Monza Studios and SB Productions, the Liquidators have been damaged in the amount of $7,300,00 plus interest, attorneys' fees and costs of collection.

**First Cause of Action**
**Intentional Fraudulent Conveyance –**
**Former New York Debtor and Creditor Law §§ 276 and 276-a**

156.   Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 155 inclusive, as if fully set for herein.

157.   The Liquidators represent the creditors of the Debtors by virtue of their appointment as Joint Liquidators of the Debtors and Creditors under the BVI Insolvency Act. At all times relevant to this Complaint, there was at least one creditor that held a matured or unmatured claim against the Debtors through 1MDB or SRC International.

158.    Between September 21, 2012 and October 22, 2012, Jho Low and/or Eric Tan caused Alsen Chance to transfer $3,300,000 to the SB Productions Account and, during that same time period, Alsen Chance did not receive any money back from the SB Productions Account or any other consideration from SB Productions in exchange for the transfer.

159.    Similarly, between November 11, 2013 and December 26, 2013, Jho Low and/or Eric Tan caused Affinity to transfer $1,800,000 to the Monza Studios Account and, during that same time period, Affinity did not receive any money back from the Monza Studios Account or any other consideration from Monza Studios in exchange for the transfer.

160.    Similarly, between June 19, 2014 and September 4, 2014, Jho Low and/or Eric Tan caused Affinity to transfer $2,200,000 to the Dean Account and, during that same time period, Affinity did not receive any money back from the Dean Account or any other consideration from Dean in exchange for the transfer.

161.    Thus, between September 21, 2012 and September 4, 2014, Jho Low and/or Eric Tan caused the Debtors to transfer $7,300,000 to Defendants and, during that same time period, the Debtors did not receive any money back from the Defendants or any other consideration from the Defendants in exchange for the Fraudulent Transfers. Consequently, a net amount of $7,300,000 was conveyed from the Debtors to the Defendants.

162.    Jho Low and/or Eric Tan caused the Debtors to make the Fraudulent Transfers with actual intent to hinder, delay or defraud their creditors as evidenced by the facts that:

a.    Jho Low and/or Eric Tan caused the Debtors to make the Fraudulent Transfers to Dean—a close personal friend of Jho Low—and Dean's companies;

b.    Neither the Debtors nor the Defendants disclosed the Fraudulent Transfers;

c.    The Debtors' sole operators and beneficial owners, Jho Low and Eric Tan, both absconded from Malaysia less than a year after the last of the Fraudulent Transfers;

d.    The value of the consideration received by the Debtors from the Defendants, if any, was not of reasonably equivalent value to the net total transferred to Defendants; and

23

e.      After the Fraudulent Transfers, the Debtors, 1MDB, and SRC International became insolvent.

163.    Based on the foregoing, pursuant to former Sections 276 and 276-a of the DCL, Plaintiffs, as the court appointed liquidators of the Debtors and Creditors, are entitled to judgment: (1) avoiding and preserving the Fraudulent Transfers; (b) directing that the Fraudulent Transfers be set aside; (c) recovering the Fraudulent Transfers, or the value thereof, from Defendants for the benefit of the Debtors' estate and its creditors; and (d) recovering attorney's fees from the Defendants.

### Second Cause of Action
### Constructive Fraudulent Conveyance –
### Former New York Debtor Creditor Law §§ 273-275

164.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 163 inclusive, as if fully set for herein.

165.    The Liquidators represent the creditors of the Debtors by virtue of their appointment as Joint Liquidators under the BVI Insolvency Act. At all times relevant to this Complaint, there was at least one creditor that held a matured or unmatured claim against the Debtors through 1MDB or SRC International.

166.    Due to the Insiders' fraudulent scheme, the Debtors lacked liquidity and were knowingly insolvent during all relevant times.

167.    Between September 21, 2012 and October 22, 2012, Jho Low and/or Eric Tan caused Alsen Chance to transfer $3,300,000 to the SB Productions Account and, during that same time period, Alsen Chance did not receive any money back from the SB Productions Account or any other consideration of reasonably equivalent value from SB Productions in exchange for the transfer.

168.    Similarly, between November 11, 2013 and December 26, 2013, Jho Low and/or Eric Tan caused Affinity to transfer $1,800,000 to the Monza Studios Account and, during that same time period, Affinity did not receive any money back from the Monza Studios Account or

any other consideration of reasonably equivalent value from Monza Studios in exchange for the transfer.

169.    Similarly, between June 19, 2014 and September 4, 2014, Jho Low and/or Eric Tan caused Affinity to transfer $2,200,000 to the Dean Account and, during that same time period, Affinity did not receive any money back from the Dean Account or any other consideration of reasonably equivalent value from Dean in exchange for the transfer.

170.    Thus, between September 21, 2012 and September 4, 2014, Jho Low and/or Eric Tan caused the Debtors to transfer $7,300,000 to Defendants and, during that same time period, the Debtors did not receive any money back from the Defendants or any other consideration of reasonably equivalent value from the Defendants in exchange for the Fraudulent Transfers. Consequently, a net amount of $7,300,000 was conveyed from the Debtors to the Defendants.

171.    Jho Low and/or Eric Tan caused the Debtors to make the Fraudulent Transfers at a time when the Debtors were insolvent, or, in the alternative, became insolvent as a result of each of the Fraudulent Transfers and other similar fraudulent transactions directed by the Insiders.

172.    Jho Low and/or Eric Tan caused the Debtors to make the Fraudulent Transfers at a time when the Debtors, 1MDB and SRC International engaged in business and transactions after which their remaining property constituted unreasonably small capital.

173.    Jho Low and/or Eric Tan caused the Debtors to make the Fraudulent Transfers at a time when they intended the Debtors to incur, or believed that the Debtors would incur, debts beyond their ability to pay as they mature.

174.    Based on the foregoing, pursuant to former Sections 273 through 275 of the DCL, Plaintiffs, as the court appointed liquidators of the Debtors and Creditors, are entitled to judgment: (1) avoiding and preserving the Fraudulent Transfers; (b) directing that the Fraudulent Transfers be set aside; (c) recovering the Fraudulent Transfers, or the value thereof, from Defendants for the benefit of the Debtors' estate and its creditors.

**Third Cause of Action**
**Unjust Enrichment**

175. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs 1 through 174 inclusive, as if fully set for herein.

176. Defendants have been enriched in the total amount of $7,300,000 by receiving the Fraudulent Transfers.

177. Jho Low and/or Eric Tan caused the Debtors to make the Fraudulent Transfers in furtherance of their scheme to defraud the Debtors' creditors.

178. Defendants' enrichment as a result of the Fraudulent Transfers harmed Plaintiffs, through the Debtors' creditors, by depriving them of their ability to collect on money owed.

179. Equity and good conscience require that Defendants not be permitted to retain the funds obtained through the Fraudulent Transfers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand Judgment against Defendants for the following relief:

A. On behalf of the Liquidators in their capacity as the foreign representatives and joint liquidators for Affinity, Alsen Chance, Aabar BVI and Blackstone and as against Defendants, damages in an amount to be determined at trial, but not less than $7,300,000, for the Fraudulent Transfers;

B. On behalf of the Liquidators in their capacity as the foreign representatives and joint liquidators for Affinity, Alsen Chance, Aabar BVI and Blackstone, an award of attorneys' fees pursuant to Section 276-a of the DCL;

C. On behalf of the Liquidators in their capacity as the foreign representatives and joint liquidators for Affinity, Alsen Chance, Aabar BVI and Blackstone, an award of prejudgment interest and costs; and

D. On behalf of the Liquidators in their capacity as the foreign representatives and joint liquidators for Affinity, Alsen Chance, Aabar BVI and Blackstone, such other and further relief as the Court may deem just, fair and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to the Federal Rules of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues so triable.

26

Respectfully submitted:          **REED SMITH LLP**

Dated: May 12, 2026  
      New York, New York  

_/s/ Casey D. Laffey_

Casey D. Laffey  
Ian Turetsky  
Rob Carnes (_pro hac vice admission forthcoming_)  
599 Lexington Avenue  
New York, New York 10022  
212-521-5400  
claffey@reedsmith.com  
ituretsky@reedsmith.com  
rcarnes@reedsmith.com  

_Attorneys for Plaintiffs_

27